**MYRIAD DEVELOPMENT, INC., Plaintiff,**

v.

**ALLTECH, INC., Defendant.**

**Cause No. 1:08–CV–0253–JRN.**

United States District Court, W.D. Texas, Austin Division.

March 28, 2011.

Adam D. Nugent, John H. Fleming, Patricia B. Cunningham, Sutherland Asbill & Brennan, LLP, Atlanta, GA, David E. Weslow, Wiley Rein LLP, Washington, DC, J. Stephen Ravel, Kelly Hart & Hallman LLP, Austin, TX, for Plaintiff.

Fran M. Jacobs, Duane Morris LLP, New York, NY, Gregory Matthew Luck, R. Brandon Bundren, Thomas W. Sankey, Wesley W. Yuan, Duane Morris LLP, Houston, TX, Joseph J. Aronica, Robert H. Dietrick, Duane Morris LLP, Washington, DC, Katherine Fergus, Duane Morris, LLP, Boston, MA, for Defendant.

## FINAL JUDGMENT

JAMES R. NOWLIN, District Judge.

Before the Court in the above-entitled and styled case of action are the following cross-motions for post-verdict relief: (1) Myriad Development, Inc.'s Motion For Judgment (**Dkt. No. 433**), filed March 13, 2010; (2) Alltech, Inc.'s Opposition To Plaintiff's Motion For Judgment And Defendant's Motion To Enter Judgment To Conform The Verdict To The Evidence (**Dkt. No. 449**), filed April 2, 2010; (3) Myriad Development, Inc.'s Reply In Support Of Motion For Judgment And In Opposition To Defendant's Motion To Conform The Verdict To The Evidence (**Dkt. No. 464**), filed April 26, 2010; (4) Alltech, Inc.'s Sur–Reply In Further Opposition To Plaintiff's Motion For Entry Of Judgment And In Further Support Of Defendant's Motion To Conform The Verdict To The Evidence (**Dkt. No. 466**), filed May 3, 2010; (5) Myriad Development, Inc.'s Sur–Reply In Support Of Motion For Judgment And In Opposition To Defendant's Motion To Enter Judgment To Conform The Verdict To The Evidence (**Dkt. No. 485**), filed June 1, 2010; (6) Alltech, Inc.'s Court–Ordered Brief (**Dkt. No. 507**), filed February 14, 2011; (7) Myriad Development, Inc.'s Court–Ordered Brief (**Dkt. No. 511**), filed February 15, 2011; (8) Alltech, Inc.'s Response To Plaintiff's Court–Ordered Brief (**Dkt. No. 513**), filed February 23, 2011; and (9) Myriad Development, Inc.'s Reply In Support Of Its Court–Ordered Brief (**Dkt. No. 516**), filed March 1, 2011.

After an exhaustive review of the applicable law and the evidence presented at trial, the Court concludes that Myriad Development, Inc.'s motion must be **GRANTED IN PART AND DENIED IN PART.** Likewise, Alltech, Inc.'s motion must be **GRANTED IN PART AND DENIED IN PART.** In summary of the Court's holdings, Plaintiff/Counter–Defendant Myriad Development, Inc. ("Myriad") may only recover the following damages: (1) $21,263.00 for unpaid amounts under the APPRISE Agreement; (2) $198,110.00 for unpaid amounts under the Subcontract for Labor; and (3) $250,000.00 in reasonable royalty fees for trade secret misappropriation. Defendant/Counter–Plaintiff Alltech, Inc. ("Alltech") is not entitled to recover any damages.

## I. STANDARD OF REVIEW

Alltech's Response and concomitant motion is, as far as the Court can discern, a renewed motion for judgment as a matter of law under Rule 50(b) of the Federal Rules Of Civil Procedure.[1] "A motion for judgment as a matter of law (previously, motion for directed verdict or J.N.O.V.) in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict."[2] In considering Alltech's motion, the Court must consider all the evidence before the jury.[3] When reviewing all of the evidence, the Court must

---

1. Alltech has entitled its motion "Opposition To Plaintiff's Motion For Judgment And Defendant's Motion To Enter Judgment To Conform The Verdict To The Evidence." However, in the body of its motion, Alltech has provided the standard of review for a Rule 50(b) Motion For Judgment As A Matter Of Law. *See* Alltech's Resp. (Dkt. No. 449) at pp. 2–3.

2. *Allstate Ins. Co. v. Receivable Fin. Co., L.L.C.*, 501 F.3d 398, 405 (5th Cir.2007)(quot-

ing *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir.1995)); *see also Smith v. Louisville Ladder Co.*, 237 F.3d 515, 525 n. 2 (5th Cir.2001)(noting that a motion for judgment notwithstanding the verdict should be treated as a motion for judgment as a matter of law in accordance with Fed.R.Civ.P. 50).

3. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51, 120 S.Ct. 2097, 147 L.Ed.2d 105(2000).

draw all reasonable inferences in favor of the nonmovant, and the Court cannot weigh the evidence or make credibility determinations.[4] Additionally, "the court must be 'especially deferential' to the jury's findings."[5] Therefore, a "jury verdict must stand unless there is lack of substantial evidence, viewed in the light most favorable to the successful party, to support the jury's factual findings, or the legal conclusions implied from the jury's verdict cannot, in law, be supported by those findings."[6]

## II. FACTUAL AND PROCEDURAL BACKGROUND

Myriad is a technology company that traditionally provided software and other services to insurance companies in order to assist in the management of property inspections. In particular, Myriad licenses its proprietary inspection management system under the name "Risk Manager" system (formerly known as the "Apprise" system). Myriad created the Risk Manager system in 2001 in order to streamline and automate an insurance company's inspection process. Risk Manager is a client/server system. The server side of the system allows a company to dictate and manage the information inspectors collect in the field. The client side of the system is a laptop computer or handheld tablet the inspector uses to collect the data and to send the data back to the server. In essence, Risk Manager guides an inspector through the inspection process.

Alltech is in the business of deploying teams of inspectors to presidentially-declared disaster areas in order to perform housing inspections on an expedited basis.[7] Alltech has provided such disaster-related inspection services to the Federal Emergency Management Agency (FEMA) since 1995, and FEMA continues to award contracts to Alltech.

Prior to this dispute, Alltech had a five-year contract with FEMA that expired in 2005. In 2004, FEMA began requiring inspectors to provide two photographs per inspection. To meet this requirement, Alltech developed a system called "PB Photo Inspection" in 2005. In essence, "PB Photo Inspection" was software that was installed on a hand-held tablet PC computer that allowed Alltech field inspectors in the disaster areas to transmit photos from a camera onto the hand-held tablet. Once the tablet was connected to a telephone line, Alltech could then transfer the photos from the hand-held tablet to a common storage server that Alltech maintained. At the conclusion of the 2000–2005 FEMA contract, Alltech sought to update and upgrade its data collection software before it bid on any new FEMA contracts. To accomplish this task, Alltech turned to Myriad.

In 2005, Alltech and Myriad entered into the following three contracts related to Alltech's work for FEMA, which are now in dispute:

(1) the "APPRISE Agreement," entered on June 6, 2005;

---

4. *Id.;* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 150–51, 120 S.Ct. 2097 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

5. *Argo v. Woods,* 399 Fed.Appx. 1, 3 (5th Cir.2010)(citing *Brown v. Bryan County, OK,* 219 F.3d 450, 456 (5th Cir.2000)).

6. *Id.* (citing *Am. Home Assur. Co. v. United Space Alliance,* 378 F.3d 482, 487 (5th Cir. 2004)).

7. Alltech, Inc. is a subsidiary of Parsons Brinckerhoff.

(2) the "AIMS Agreement," entered on June 30, 2005; and

(3) the "Subcontract for Labor Agreement," entered on May 3, 2007.

At trial, Alltech claimed that it hired Myriad to increase the data storage and the data transfer capabilities of Alltech's PB Photo Inspection. On the other hand, Myriad rebutted that Alltech did not have a system called "PB Photo Inspection" in 2005, and thus, Alltech merely hired Myriad to customize Myriad's Risk Manager system for Alltech's FEMA work.

The agreement for Myriad to customize Myriad's Risk Manager system and/or Alltech's PB Photo Inspection was memorialized in the "APPRISE Agreement" on June 6, 2005. The APPRISE Agreement permitted Alltech to utilize Myriad's Risk Manager system in order to process property inspections related to the FEMA disaster response program. The first version of the system that Myriad customized for Alltech under the APPRISE Agreement was called "Photo Ace."[8] In 2006, Myriad designed and developed a successor to the 2005 "Photo Ace" called "PB Ace."

On June 30, 2005, Myriad and Alltech entered into a second agreement called the "AIMS Agreement." The AIMS Agreement provided the terms for Myriad to develop and operate the Alltech Inspection Management System ("AIMS") for Alltech. In essence, AIMS is software that allows Alltech to locate detailed credential and contact information for qualified FEMA inspectors residing throughout the United States.

Of great importance to the present controversy, on March 30, 2007, Alltech entered into its most recent agreement with FEMA, the "FEMA PRIME Agreement." The FEMA Prime Agreement required Alltech to collect data and to take photographs of residential damage from hurricanes. Alltech was required to transmit those photographs to FEMA upon request. As of the trial in this case, the FEMA Prime Agreement was scheduled to last until September 30, 2010.

The parties executed the "Subcontract for Labor" on May 3, 2007—two years after the APPRISE and AIMS Agreements. The Subcontract for Labor governed certain staffing and personnel services that Myriad provided to Alltech for Alltech's performance under the FEMA PRIME Agreement.

Less than one year after Alltech and Myriad won the bid for the 2007 FEMA Prime Agreement, the current controversy arose between Myriad and Alltech. It is undisputed that on March 28, 2008, Myriad denied Alltech access to the Risk Manager system and PB Ace.[9] Myriad maintained that it suspended Alltech's access to Risk Manager because Alltech was reviewing the features and functionalities of Risk Manager and PB Ace for the improper purpose of creating: (1) a replacement user interface system, called "Pegasus," and (2) a replacement server storage database, called "DSD."

According to Myriad, development of "DSD" began in 2007, and development of "Pegasus" and "Aries" began in January of 2008. The plan to actually use "Pegasus"

---

8. The "ACE" designation in this program referred to the Federal Emergency Management Agency's ("FEMA") "ACE" program, which was the database to which information was transferred. The ACE program stored its data on the hand-held computer when it transferred the data to FEMA it went into NEMIS. The ACE program was designed,

developed, and implemented by FEMA before this lawsuit arose.

9. Although, Myriad insisted that Alltech continued to have access to the PB Ace client software installed on the inspectors' tablets, and continued to use the PB Ace client throughout April.

as a replacement system was allegedly developed in March of 2008. However, in suspending access on March 28, 2008, Myriad—by letter and by telephone—informed Alltech that Myriad would restore access if Alltech confirmed that it was not misusing Myriad's proprietary information. Mr. Hugh Inglis, the principal-in-Charge of Parson Brinckerhoff's FEMA Housing Project, testified that he would not provide Myriad with the requested confirmation.

On the other hand, Alltech stated at trial that Myriad denied Alltech access to Risk Manager in order to compel contractual re-negotiations and an extension of the existing agreements. Alltech argued that it was forced to develop a replacement to the Risk Manager system and PB Ace in April 2008 so that it could continue performing under its FEMA contract after Myriad denied Alltech access to such systems. Alltech insisted at trial that "Pegasus" and "DSD" were created on a blank sheet of paper without the use of any of Myriad's source code or other confidential information.

On March 28, 2008, Myriad sent a "Notice Of Cancellation of the APPRISE Agreement" to Alltech. On April 3, 2008, Alltech responded by sending a sixty-day notice, pursuant to section 14(a) of the Agreement, informing Myriad that Alltech would not be renewing the APPRISE Agreement for any additional one-year terms. Additionally, on April 30, 2008, Alltech served Myriad with a sixty-day notice, pursuant to section 10(a) of the Agreement, that Alltech would not be renewing the AIMS AGREEMENT for any additional one-year terms. Finally, on May 30, 2010, Myriad sent a "Notice Of Cancellation of the AIMS Agreement" to Alltech.[10]

On April 2, 2008, Myriad filed the present lawsuit seeking damages and injunctive relief. Thereafter, Alltech filed counterclaims against Myriad seeking damages, specific performance, injunctive relief, and declaratory relief.

## A. MYRIAD'S CLAIMS

In its Second Amended Complaint, Myriad asserted the following six causes of action against Alltech: (1) breach of contract—APPRISE Agreement; (2) breach of contract—AIMS Agreement; (3) breach of contract—Subcontract for Labor; (4) trade secret misappropriation; (5) unfair competition by misappropriation; and (6) unjust enrichment.[11] In sum, Myriad alleged that Alltech failed to pay sums due under the contracts and breached the specific sections of the APPRISE and AIMS Agreements that forbid misuse and improper disclosure of Myriad's proprietary information.

On August 3, 2009, Alltech filed four separate motions seeking summary judgment on Myriad's claims for: (1) breach of contract—APPRISE Agreement; (2) breach of contract—AIMS Agreement; (3) breach of contract—Subcontract for Labor; (4) trade secret misappropriation; and (5) unfair competition by misappropriation.[12] Alltech also filed a motion seeking summary judgment on Myriad's claims for damages.[13] The only claim that Alltech did not seek summary judgment on was Myriad's unjust enrichment claim.

---

10. Notably, Myriad's notices were notices of *cancellation*. In contrast, Alltech's notices were notices of non-renewal.

11. *See* Clerk's Dkt. No. 103 at ¶¶ 33–60.

12. *See* Clerk's Dkt. Nos. 200–205. Alltech also sought summary judgment on its conver-

sion counterclaims. *See* Clerk's Dkt. No. 203. The Court denied Alltech's request for summary judgment on this claim. *See* Clerk's Dkt. No. 360.

13. *See* Clerk's Dkt. No. 201.

On February 18, 2010, the Court granted in part Alltech's Motion for Summary Judgment on Myriad's claim for damages.[14] In that Order, the Court ruled that Myriad could seek the following damages at trial: (1) loss of enterprise value (as compensation for trade secret misappropriation); (2) direct lost profits through September 30, 2010 (as compensation for trade secret misappropriation and breach of the AIMS and APPRISE Agreements).[15] In the same Order, the Court granted summary judgment in favor of Alltech on Myriad's claims for: (1) direct lost profits from October 1, 2011 until September 30, 2012; and (2) verification services lost profits, *i.e.* indirect lost profits.[16] The Court concluded, *inter alia*, that these damages were too speculative under Texas law.[17] The Court, however, denied Alltech's remaining four motions for summary judgment.[18]

## B. ALLTECH'S COUNTERCLAIMS

In its Answer, Alltech asserted the following six counterclaims against Myriad: (1) breach of contract—AIMS Agreement; (2) breach of contract-APPRISE Agreement; (3) conversion of the AIMS source code under the AIMS Agreement; (4) breach of contract—Subcontract for Labor; (5) conversion of photographs under the Subcontract for Labor; and (6) conversion of photographs based upon the breach

of a bailment agreement.[19] Alltech essentially asserted that Myriad breached the three contracts at issue by failing to give proper notice of termination, by failing to release inspection photographs stored on Myriad's server, and by failing to provide the AIMS source code.

On August 4, 2009, Myriad filed a motion seeking summary judgment on Alltech's counterclaims for: (1) breach of contract—Subcontract for Labor; (2) conversion of photographs under the Subcontract for Labor; and (3) conversion of the AIMS source code under the AIMS Agreement.[20] Myriad also sought summary judgment on Alltech's request for the equitable remedy of specific performance under the Subcontract for Labor.[21]

■ On February 18, 2010, the Court granted in part and denied part Myriad's motion for partial summary judgment.[22] In that Order, the Court granted summary judgment in favor Myriad on Alltech's counterclaims for: (1) breach of contract—Subcontract for Labor; (2) specific performance—Subcontract for Labor;[23] (3) conversion of AIMS source code under the AIMS Agreement.[24] Additionally, the Court held that Alltech did not have a viable counterclaim for conversion of photographs based upon the Subcontract for Labor; therefore, the Court granted summary judgment in Myriad's favor insofar

---

**14.** *See* Clerk's Docket No. 356.

**15.** *Id.*

**16.** *Id.*

**17.** *Id.*

**18.** *See* Clerk's Dkt. Nos. 357–359.

**19.** *See* Clerk's Dkt. No. 113 at ¶ 74–121; Clerk's Dkt. No. 360 (Order construing Alltech's photograph conversion claim).

**20.** *See* Clerk's Dkt. No. 206.

**21.** *Id.*

**22.** *See* Clerk's Dkt. No. 360.

**23.** "Specific performance is an equitable remedy that may be awarded at the trial court's discretion upon a showing of breach of contract ... Specific performance is not a separate cause of action, but rather it is an equitable remedy used as a substitute for monetary damages when such damages would not be adequate." *Paciwest, Inc. v. Warner Alan Props., LLC,* 266 S.W.3d 559, 571 (Tex.App.- Fort Worth 2008, pet. denied).

**24.** *See* Clerk's Dkt. No. 360.

as Alltech sought to assert such a counter-claim.[25]

On the morning of March 1, 2010, jury selection and trial commenced.[26] Plaintiff rested on March 2, 2010.[27] The next morning, on March 3, 2010, Alltech filed a motion requesting judgment as a matter of law on, *inter alia,* Myriad's request for the remedy of unjust enrichment.[28] On March 5, 2010, the Court granted Alltech's request for judgment as a matter of law on Myriad's claim of unjust enrichment.[29] On the same day, the parties closed, and after being duly charged, the jury retired to deliberate on a verdict.[30] On March 8, 2010, the jury returned a verdict in response to the questions and instructions submitted to them.[31]

### C. The Jury's Verdict

With regard to Myriad's claims and Alltech's defenses to such claims, the jury unanimously reached the following twenty-two factual conclusions from a preponderance of the evidence:

(1) Alltech materially breached the APPRISE Agreement;

(2) Myriad did not materially breach the APPRISE Agreement before any material breach by Alltech;

(3) Myriad did not repudiate the APPRISE Agreement;

(4) Alltech's failure to comply with the APPRISE Agreement was not the result of duress;

(5) Myriad did not ratify any failure by Alltech to comply with the APPRISE Agreement;

(6) Alltech's failure to comply with the terms of the APPRISE Agreement was not excused under the doctrine of estoppel;

(7) Myriad is not precluded from obtaining equitable relief for breach of the APPRISE Agreement because of unclean hands;

(8) Alltech materially breached the AIMS Agreement;

(9) Myriad did not materially breach the AIMS Agreement before any material breach by Alltech;

(10) Myriad did not repudiate the AIMS Agreement;

(11) Alltech's failure to comply with the AIMS Agreement was not the result of duress;

(12) Myriad did not ratify any failure by Alltech to comply with the AIMS Agreement;

25. *Id.*

26. *See* Clerk's Dkt. No. 384.

27. *See* Clerk's Dkt. Nos. 394.

28. *See* Clerk's Dkt. No. 387. In the same motion, Alltech also sought judgment as a matter of law on Myriad's claims for breach of the APPRISE and AIMS Agreements. Thereafter, in separate motions, Alltech requested judgment as a matter of law on: (1) Myriad's request for exemplary damages; (2) Myriad's claim for unfair competition by misappropriation; (3) Myriad's request for lost profits; (4) Myriad's request for damages for misappropriation of trade secret; (5) Myriad's defenses to Alltech's counterclaims; and (6) Myriad's claim for breach of contract. *See* Clerk's Dkt. Nos. 388-389, 393, 411 and 429.

Finally, Alltech filed a motion seeking judgment as a matter of law on its own conversion counterclaim. *See* Clerk's Dkt. No. 391. The Court denied all of these requests for judgment as a matter of law. *See* Clerk's Dkt. Nos. 434–440 and 442

Defendant rested on March 3, 2010. *See* Clerk's Dkt. No. 403. Thereafter, Myriad filed a motion for judgment as a matter of law on Alltech's conversion counterclaim. The Court denied Myriad's motion. *See* Clerk's Dkt. No. 410.

29. *See* Clerk's Dkt. No. 412.

30. *See* Clerk's Dkt. No. 414.

31. *See* Jury Interrogatories (Dkt. No. 428).

(13) Alltech's failure to comply with the terms of the AIMS Agreement was not excused by the doctrine of estoppel;

(14) Myriad is not precluded from obtaining equitable relief for breach of the AIMS Agreement because of unclean hands;

(15) Alltech materially breached the Subcontract for Labor;

(16) Myriad did not repudiate the Subcontract for Labor;

(17) Alltech's failure to comply with the Subcontract of Labor was not the result of duress;

(18) Myriad did not ratify any failure by Alltech to comply with the Subcontract for Labor;

(19) Alltech misappropriated Myriad's trade secrets;

(20) Myriad is not precluded from obtaining equitable relief it seeks for trade secret misappropriation because of unclean hands;

(21) The trade secret misappropriation resulted from malice; and

(22) Alltech did not engage in unfair competition by misappropriation.[32]

Based on the foregoing factual findings on liability, the jury awarded the following damages to Myriad:

(1) $1,000,000.00 in lost profits for breach of the APPRISE Agreement;

(2) $647,000.00 for unpaid amounts under the APPRISE Agreement;

(3) $37,400.00 in lost profits for breach of the AIMS Agreement; [33]

(4) $198,110.00 in unpaid amounts under the Subcontract for Labor;

(5) $250,000.00 in reasonable royalty for misappropriation of trade secrets;

The jury also found by clear and convincing evidence that Alltech misappropriated Myriad's trade secrets with malice. Based on this finding, the jury awarded Myriad $2,000,000.00 in exemplary damages.[34]

With regard to Alltech's counterclaims and Myriad's defenses to such counterclaims, the jury unanimously reached the following four factual conclusions from a preponderance of the evidence:

(1) Myriad did not materially breach the APPRISE Agreement;

(2) Myriad did not materially breach the AIMS Agreement;

(3) Myriad converted the inspection photographs by refusing to return the photographs to Alltech; and

(4) Alltech is precluded from obtaining equitable relief for conversion because of its unclean hands.[35]

The jury did not award any damages to Alltech for Myriad's conversion of the photographs or any other counterclaim.[36] The jury did, however, provide the following hand-written note on the interrogatory for conversion damages: "Note: Jury requests that Myriad return photographs to PB/Alltech immediately." [37]

### D. Myriad's Post-trial Motion

Myriad's current motion requests the Court to enter judgment against Alltech consistent with the jury's verdict. In response, Alltech filed a "Motion To Enter Judgment To Conform The Verdict To The

---

**32.** *Id.* at pp. 2–7, 9–15, 17–21, 23–24, 26, 28.

**33.** The jury found $0 for unpaid amounts under the AIMS Agreement. *See* Interrogatory No. 2G (Dkt. No. 428) at p. 16.

**34.** *See* Jury Interrogatories (Dkt. No. 428) at pp. 8, 16, 22, 25, 27.

**35.** *See* Jury Interrogatories (Dkt. No. 428) at pp. 32–41 and 43.

**36.** *See* Jury Interrogatory No. 8B (Dkt. No. 428) at p. 42.

**37.** *Id.*

Evidence." As Alltech summarizes, it opposes Myriad's motion on the following four grounds:

Myriad's Proposed Judgment impermissibly:

 (1) gives Myriad triple recovery for a single alleged injury;

 (2) grants Myriad [sic] damages for breach of contract which are expressly precluded by two of the contracts for which Myriad seeks judgment (and for which Myriad itself did not seek damages in its Complaint);

 (3) provides Myriad with a so-called "reasonable royalty" which is both wholly lacking in any evidentiary support and is based on a purported valuation of the trade secrets two years prior to their alleged misappropriation; and

 (4) grants punitive damages in the absence of actual damages, disproportionate to any damages for misappropriation and in the absence of any evidence of malice.[38]

Alltech also maintains that the jury verdict improperly "deprives Alltech of those damages (value of the converted property) necessarily due as a result of the jury's finding of Myriad's conversion."[39] Based on these arguments, Alltech requests the Court to reform the jury verdict. The Court will address each argument prior to entering Judgment.

## III. DISCUSSION

### A. Myriad's Damages

The Court will first discuss the arguments that pertain to Myriad's damages.

#### 1. Subcontract For Labor

First and foremost, Alltech does not oppose entering judgment on the $198,110.00 the jury awarded to Myriad for Alltech's breach of the Subcontract for Labor.[40] An independent review confirms that the evidence at trial supports these damages. Absent any objection, the Court will enter a final judgment on this amount.

#### 2. Limitation Of Remedies Provision In the APPRISE and AIMS Agreements

Alltech does, however, oppose the entry of judgment on Myriad's damages for breach of the AIMS and APPRISE Agreements. Specifically, Alltech contends that the Court should, as a matter of law, disregard the jury's finding of damages for breach of the APPRISE and AIMS Agreements pursuant to an identical limitation of remedies provision contained in both Agreements.[41] Paragraph 14(b)—entitled "Term and Termination"—provides:

---

38. Alltech's Resp. (Dkt. No. 449) at p. 1.

39. *Id.* at p. 2.

40. *Id.* at p. 4 ("Myriad is left with only one viable claim for damages, $198,110.00 for beach of the Subcontract.").

41. Notably, this is the first time Alltech has fully and explicitly brought this issue to the Court's attention. Alltech failed to even plead this contractual limitation of liability provision as an affirmative defense in any of the three Answers it filed in this case. *See* Clerk's Dkt. No. 30 (Answer to Original Complaint) at pp. 5–6, ¶¶ 51–54, Dkt. No. 55 (Answer to First Am. Compl.) at pp. 7–8, ¶¶ 1–16; and Dkt. No. 113 (Answer To Second Am. Compl.) at pp. 7–8, ¶¶ 1–16; *See also Borders v. KRLB,*

*Inc.,* 727 S.W.2d 357, 359–60 (Tex.App.Amarillo 1987, writ ref'd n.r.e.)(explaining that contractual limitation of liability is an affirmative defense under Texas law.); *Mistletoe Exp. Serv. v. Sanchez,* 721 S.W.2d 418, 420 (Tex.App.Corpus Christi 1986, writ ref'd n.r.e.)(failure to specifically plead limitation of liability statute as an affirmative defense resulted in waiver of that defense); *Allianz Versicherungs, AG v. Profreight Brokers Inc.,* 99 Fed.Appx. 10, 12 (5th Cir.2004)("Assuming without deciding that contractual limitation of liability is an affirmative defense subject to Fed.R.Civ.P. 8(c) ...").

In its Court-ordered brief, Alltech "takes exception" with the Court's observation of this fact, in part, because Alltech incorrectly

In the event of any default by either party and a failure to cure such default within thirty (30) days after receipt of written notice thereof, the non-defaulting party may terminate this Agreement ... Except for the remedies for nonpayment set forth in Section 6, and the indemnification rights set forth in Section 12, **cancellation shall be the sole remedy available to either party in the event of default.**[42]

Relying on Paragraph 14(b),[43] Alltech maintains that the Court should disregard the jury's award of $1,647,000.00 for its breach of the APPRISE Agreement and $37,400.00 for breach of the AIMS Agreement.

In response to Alltech's argument, Myriad contends that a subsequent provision contained in both the APPRISE and AIMS Agreements expressly allows Myriad to recover monetary damages for any breach other than a breach for nonpayment. Paragraph 15(b)—entitled "General Provisions"—provides:

In the event of a breach or threatened breach of any of the provisions of this Agreement by Alltech, Myriad shall be entitled to, and Alltech hereby consents to the entry of, preliminary and permanent Injunctive relief to enforce the provisions hereof. **Nothing herein shall preclude Myriad from pursuing any action or other remedy for any breach or threatened breach of this Agree-**

contends that it raised the affirmative defense in its Answer to Myriad's Second Amended Complaint. *See* Alltech's Resp. (Dkt. No. 507) at n. 1. However, Alltech's exception is entirely misplaced. By its own admission, Alltech did not raise the specific affirmative defense of limitation of liability in its Answer. Instead, Alltech "raised the issues of ambiguity and lack of damages in its Answer." *Id.* These are clearly not the same as a contractual limitation of liability affirmative defense.

Additionally, Alltech did not raise this defense in any of its five motions for summary judgment filed prior to trial, even though Alltech filed a motion seeking summary judgment on Myriad's claim for contractual damages.

Alltech did make the following brief and vague reference to the defense in one of the many Motions For Judgment As A Matter Of Law that it filed on the first day of trial: "To the extent Myriad relies for its damages on the alleged loss of income it would have received under the APPRISE or AIMS AGREEMENTS, Myriad ignores the termination provisions of the APPRISE and AIMS AGREEMENTS which limit its damages to termination only." *See* Clerk's Dkt. No. 387 at p. 8. Alltech, however, did not provide a quotation of or a citation to the contractual paragraph that it was referencing in its Motion For Judgment As A Matter Of Law. *Id.* at pp. 8–9. Consequently, the Court was not

able to fully understand the argument presented in Alltech's motion.

Alltech did subsequently file a *supplemental* brief with proper citations and quotations, but such brief was belatedly filed on March 9, 2010 at 2:55 p.m. CST—after the jury had already deliberated and returned a verdict. *Compare* Clerk's Dkt. No. 428 (Jury Verdict) *with* Clerk's Dkt. No. 429 (Supplemental Brief); *See also* Fed.R.Civ.P. 50(A)(a)("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury."). Alltech now renews its argument under Rule 50(b)—this time with proper citations to and quotations from the Agreement—for the Court to re-consider.

Based on the above, Alltech may have waived its affirmative defense. The Court will nevertheless address the argument because Myriad has failed to assert a waiver argument and because Alltech's argument is unavailing.

**42.** Trial Ex. D264 (APPRISE Agreement) at ¶ 14(b)(emphasis added); Trial Ex. D225 (AIMS Agreement) at ¶ 10(b).

**43.** The contractual provisions at issue are identical in both the AIMS and APPRISE Agreements. Therefore, strictly for ease of reference, the Court will only discuss the relevant paragraphs in the APPRISE Agreement, but the analysis shall also apply to the identical provisions in the AIMS Agreement.

**ment all of which remedies shall be cumulative.**[44]

Based on Paragraph 15(b), Myriad asks the Court to award the full amount of contractual damages found by the jury.

Alltech is correct that Paragraph 14(b) ostensibly provides that cancellation of the contract shall be the exclusive remedy available to either party in the event of default. Yet, to the contrary, Myriad is also correct that Paragraph 15(b) simultaneously provides that Myriad may nevertheless pursue *any* action or other remedy for any breach of the Agreement. Thus, the problem presented is that—if not harmonized—Paragraphs 14(b) and 15(b) are in direct conflict with each other regarding the remedies available to Myriad in the event of a default or breach. Simply put, in the Court's view, the problem presented is that the APPRISE and AIMS Agreements are both poorly-drafted contracts.

Seeking to resolve this problem, both parties have made unsuccessful attempts to reconcile Paragraphs 14(b) and 15(b). Neither Myriad nor Alltech has presented a reasonable interpretation and/or reconciliation of these two important provisions. The Court will address both parties' interpretations in turn. The Court will then provide its own harmonization of Paragraphs 14(b) and 15(b).

### a. Alltech's Interpretation of Paragraphs 14(b) and 15(b)

Alltech does not attempt to reconcile the two provisions as much as it tries to demonstrate that 14(b) should control. Ac-cording to Alltech, Paragraph 15(b) "is a general paragraph common to many agreements which simply preserves the parties' rights to equitable relief."[45] Alltech further insists that by contrast, Paragraph 14(b) is a specific provision that dictates the sole remedy—cancellation—in the event of any breach other than a breach for "nonpayment."[46] Under Alltech's interpretation, Paragraph 14(b) controls—and therefore, dictates cancellation as Myriad's sole remedy—because 14(b) is a more specific contractual provision than 15(b).[47]

### i. Alltech's Interpretation Is Unreasonable

■ The plain language of Paragraph 15(b) defeats Alltech's interpretation.[48] Although not mentioned by Alltech, the Court acknowledges that Paragraph 15(b) is entitled "General Provisions." However, the Texas Supreme Court has explained that although "courts may consider the title of a contract provision or section to interpret a contract, 'the greater weight must be given to the operative contractual clauses of the agreement.' "[49] Employing this rule of interpretation, greater weight must be placed on the text of Paragraph 15(b), which states in relevant part: "Myriad shall be entitled to, and Alltech hereby consents to the entry of, preliminary and permanent Injunctive relief to enforce the provisions hereof. *Nothing herein shall preclude Myriad from pursuing any action or other remedy for any breach ... all of which remedies shall be cumulative.*"[50] This language reveals that Para-

---

**44.** Trial Ex. D264 (APPRISE Agreement) at ¶ 15(b)(emphasis added); Trial Ex. D225 (AIMS Agreement) at ¶ 11(b).

**45.** *See* Alltech's Sur–Reply (Dkt. No. 466) at p. 6.

**46.** *Id.* at pp. 6–7.

**47.** *Id.*

**48.** *Id.* at pp. 5–7.

**49.** *Enter. Leasing Co. Of Houston v. Barrios,* 156 S.W.3d 547, 549 (Tex.2004)(quoting *Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 600 (1959)).

**50.** Trial Ex. D264 (APPRISE Agreement) at ¶ 15(b); Trial Ex. D225 (AIMS Agreement) at ¶ 11(b).

graph 15(b) is not a general provision that preserves the equitable rights of both *parties* as Alltech claims. Indeed, 15(b) does not preserve any right whatsoever for Alltech. Rather, Paragraph 15(b) specifically permits Myriad—and only Myriad—to pursue *any* remedy for breach of the Agreement.

██ Under Alltech's interpretation, Myriad's only remedy for a non-monetary breach would be to cancel the contract and/or seek equitable relief. Yet, this interpretation contradicts the plain language of Paragraph 15(b). Paragraph 15(b) expressly allows Myriad to pursue *"any* other action or remedy." A "remedy" is the "means of enforcing a right or preventing or redressing a wrong." [51] Contrary to Alltech's argument, "remedy" includes "legal or equitable relief." [52] The fact that the parties included the phrase "any other . . . remedy" means that Myriad is entitled to seek legal relief. As such, Alltech's interpretation runs counter to the well-established rule of interpretation that a single contract provision may not be interpreted so as to destroy and contradict other express provisions. [53]

Furthermore, if the parties wanted to expressly preclude Myriad from recovering monetary damages then the parties could have done so. After all, the parties were careful to include language that expressly forbid Alltech from recovering damages from Myriad:

IN NO EVENT SHALL MYRIAD OR ANY THIRD PARTY SUPPLIER BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, PUNITIVE OR EXEMPLARY DAMAGES OR LOSSES, INCLUDING, WITHOUT LIMITATION, LOST PROFITS, DOWNTIME COSTS, LABOR COSTS, OVERHEAD COSTS OR CLAIMS OF ALLTECHS ... EVEN IF MYRIAD OR ANY THIRD PARTY SUPPLIER HAD BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. [54]

Looking at this provision, it is clear that the parties knew how to limit the recovery of lost profit damages. Yet, the parties did not similarly express an intent to limit Myriad in the same manner. The Court must presume that the omission was purposeful. [55] For all of the above reasons, Alltech's interpretation fails. [56]

### b. Myriad's Interpretation Of Paragraphs 14(a) and 15(b)

Myriad asserts that Paragraphs 14(b) and 15(b) can be reconciled because they apply to "different situations." [57] Specifically, Myriad maintains that "Paragraph

51. BLACK'S LAW DICTIONARY (9th ed. 2009).

52. *Id.; See also Khraish v. Hamed,* 762 S.W.2d 906, 910 (Tex.App.-Dallas 1988, writ denied)("Although our Texas legal system has merged legal and equitable remedies in the same courts, the distinction between legal relief and equitable relief remains.").

53. *See, e.g., Priem v. Shires,* 697 S.W.2d 860, 865 (Tex.App.-Austin 1985, no writ)(citing *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983)).

54. Trial Ex. D264 (APPRISE Agreement) at ¶ 11(b); Trial Ex. D225 (AIMS Agreement) at ¶ 8(b).

55. *See Pioneer Chlor Alkali Co. v. Royal Indem. Co.,* 879 S.W.2d 920, 938 (Tex.App.Houston [14th Dist.] 1994, no writ)(presuming an omission was purposeful when the language was expressly included in a prior contractual clause).

56. Notably, the Court interpretation reaches the same result that Alltech strived to achieve—barring Myriad from recovering lost profits damages. *Infra* section III.A.2.c.-d. (Court's harmonization and conclusion that Myriad is not entitled to recover lost profits for breach of the AIMS and APPRISE Agreements).

57. Myriad's Reply (Dkt. No. 464) at p. 7.

14(b) applies to monetary defaults, *i.e.,* failures to pay sums under the contract, rather than [other non-monetary] breaches," whereas Paragraph 15(b) "provides remedies for [any other] breach of the agreements." [58] As support, Myriad relies on the fact that Paragraph 14(b) references the remedies for nonpayment contained in Paragraph 6. Under Myriad's interpretation, "[i]n the event Alltech stopped paying sums due under the agreements, Myriad would be permitted to charge Alltech for the costs of collection and to cancel the contract [under Paragraphs 6 and 14(b)]. Where, as is the case here, Alltech breached the contracts by stealing Myriad's intellectual property, Myriad would be permitted to recover damages and obtain an injunction [under Paragraph 15(b)]." [59]

### i. Myriad's Interpretation Is Unreasonable

Myriad's interpretation of the contract is not a reasonable interpretation for three primary reasons. First and foremost, the plain language of the contract does not limit Paragraph 14(b)'s application to monetary defaults. Rather, the plain language of 14(b) indicates that it applies "in the event of *any* default." Furthermore, the

purpose of the Agreement is to grant Alltech a license to use Myriad's proprietary information system in exchange for the payment of certain fees by Alltech. To this end, only Alltech is required to make monetary payments to Myriad under the Agreement. In other words, the Agreement does not require Myriad to make any monetary payments to Alltech. It therefore follows that if Paragraph 14 only applies to monetary defaults—as Myriad urges—then Paragraph 14 would solely provide a remedy to Myriad for Alltech's monetary default(s) because only Alltech is required to make monetary payments under the Agreement. [60] Yet, that is not the case. Paragraph 14(b) expressly applies to a default "by *either* party," and mandates "the sole remedy available to *either* party in the event of a default." Thus, it is contrary to the plain language and purpose of the contract to conclude that 14(b) only applies to "monetary defaults."

Second, along the same line of reasoning, a reading of Paragraph 14(b) in conjunction with Paragraph 11(a) also reveals that the contract does not limit Paragraph 14(b)'s application to monetary defaults. [61] Paragraph 11(a)—entitled "Limitation of Liability"—provides:

58. *Id.* at p. 8.

59. *Id.* at pp. 8–9.

60. Under the Agreement, only Alltech is required to make monetary payments; Myriad was not required to make any monetary payments to Alltech under the Agreement. The only paragraph in the Agreement that requires monetary payments to be made is Paragraph 6:

6. **Charges**
(a) Alltech agrees to pay Myriad the fees listed in the Fee Schedule. All fees are due and payable within thirty (30) days of the date of the invoice....
(b) A service charge of 1.5% (or the maximum allowed by law, if less) of the invoice amount will be added to the undisputed past due balance and will be added monthly

to any unpaid past due balance until such balance is paid in full. In the event of default, Alltech shall also reimburse Myriad for all costs of collection, including reasonable attorneys' fees. MYRIAD RESERVES THE RIGHT TO SUSPEND ACCESS TO APPRISE BY ANY DELINQUENT ACCOUNT WITHOUT NOTICE.
Trial Ex. D264 at ¶ 6(a)-(b)(emphasis added); Trial Ex. D225 at ¶ 4(a)-(b). Myriad is not required to make monetary payments to Alltech under the Agreement.

61. *See, e.g., Henry v. Masson,* No. 01–07–00522–CV, 2010 WL 5395640, at *17 (Tex. App.-Houston [1st Dist.] Dec. 30, 2010, no pet.)(explaining that "[t]he contract must be read as whole, not by 'isolating a certain phrase, sentence, or section of the agreement.' ").

MYRIAD's sole obligation and liability if any information is defective, inaccurate or incomplete in any way is (in its sole discretion) to replace the information or to refund the portion of the fees paid by Alltech to Myriad under this Agreement ... and Alltech may immediately terminate this Agreement in accordance with the provisions of Section 14.[62]

Paragraph 11(a) dictates that if Myriad provides Alltech with defective information—which is not a monetary default—then Alltech is permitted to cancel the contract pursuant to Paragraph 14(b). In this regard, Paragraph 11(a) clearly demonstrates that Paragraph 14(b)'s application is not limited to defaults for nonpayment.

Third, contrary to Myriad's assertion, the fact that Paragraph 14(b)—entitled "Term and Termination" references the remedies for nonpayment defaults contained in Paragraph 6—entitled "Charges"—does not confirm that Paragraph 14(b) applies exclusively to nonpayment defaults.[63] In fact, the opposite is true. Paragraph 14(b) actually applies to all contractual defaults *other than* "nonpayment" defaults.[64] Indeed, Paragraph 14(b)'s language contradicts Myriad's interpretation: "Except for the remedies for nonpayment set forth in Section 6 ... cancellation shall be the sole remedy available to either party in the event of a default." Looking at this contractual language, Paragraph 14(b) explicitly distinguishes between the remedy available for a "nonpayment" default—(1) suspension of access to the APPRISE system and (2) reimbursement of costs and fees as provided in Paragraph 6—and the remedy available for all other defaults—cancellation. Thus, Paragraph 14(b) clearly applies to all contractual defaults *other than* "nonpayment" defaults.

For all of the above reasons, the parties' attempts to reconcile and harmonize the apparent conflict between Paragraph 14(b) and Paragraph 15(b) also fails. Accordingly, the Court must provide its own interpretation and harmonization of the parties' intent as expressed by the plain language used in the Agreements.

### c. The Court's Harmonization and Reconciliation Of Paragraphs 14(b) and 15(b)

Relying upon well-established principles of Texas law, the Court is able to harmonize Paragraphs 14(b) and 15(b) by giving different meanings to the terms "default" and "breach." When construing a written contract, the Court's primary concern is to ascertain the true intentions of the parties as expressed in the instrument.[65] The Court must consider the entire writing and attempt to harmonize and give effect to all the provisions of the contract by analyzing the provisions with reference to the whole agreement.[66] When the provisions of a

---

**62.** Trial Ex. D264 (APPRISE Agreement) at ¶ 11(a); Trial Ex. D225 (AIMS Agreement) at ¶ 8(a).

**63.** Additionally, the precise sentence in Paragraph 14(b) that Myriad relies upon also references indemnification rights set forth in Section 12: "Except for the remedies for nonpayment set forth in Section 6, and the indemnification rights set in Section 12, cancellation shall be the sole remedy available to either party in the event of a default." Yet, Section 12 has nothing to do with monetary payments or defaults. Myriad's interpreta-

tion is not reasonable for this additional reason.

**64.** Alltech ostensibly agrees with Myriad that the Agreement distinguishes between defaults for nonpayment and all other contractual defaults. Alltech, however, disputes Myriad's contention that Paragraph 14(b) applies only to nonpayment defaults.

**65.** *See, e.g. J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003).

**66.** *See, e.g., Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex.

contract appear to conflict, the Court will attempt to harmonize the provisions and assume the parties intended every provision to have some effect.[67]

### i. Texas Law Governing Breach Of Contract

■ "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform."[68] Under Texas law, a breach of contract is either a total breach or a partial breach.[69] A total breach is usually defined as a "substantial" or "material" breach of the contract.[70] A partial breach is defined as a "breach not so material as to discharge the other party's duty of performance or a breach that is so treated at the election of the other party."[71] "[T]he distinction between partial and total breach is a distinction based on how the nonbreaching party treats the breach in terms of the remedies he or she seeks."[72] If the breach is total then the non-breaching party may cease performance and sue for damages. If the breach is partial then the non-breaching party must continue performance under the contract and sue for damages.

■ "Some courts appear to confuse the distinction between total and partial breaches with the distinction between material and immaterial breaches."[73] In contrast to total and partial breaches, "[t]he distinction between material and immaterial breaches is a distinction based upon the severity of the breach."[74] The severity of the breach determines whether the non-breaching party may seek remedies for a total breach or remedies for a partial breach. When one party to a contract materially breaches the contract, the other party is—if it so chooses—discharged and freed of any obligation to perform and may at that point sue for damages.[75] Of course, a non-breaching party may nevertheless treat a material breach as either a partial breach or a total breach. In other words, if a breach of contract is material, the injured party has the right either to cease performance and sue for total breach, or to continue performance and sue for partial breach.[76] Conversely, when a breach is immaterial, the nonbreaching

2005)(per curiam); *J.M. Davidson,* 128 S.W.3d at 229.

**67.** *See, e.g., United Protective Servs., Inc. v. West Village Ltd. P'ship,* 180 S.W.3d 430, 432 (Tex.App.Dallas 2005, no pet.).

**68.** *Stewart v. Sanmina Tex., L.P.,* 156 S.W.3d 198, 214 (Tex.App.Dallas 2005, no pet.)(citing *Methodist Hosps. of Dallas v. Corporate Communicators, Inc.,* 806 S.W.2d 879, 882 (Tex.App.-Dallas 1991, writ denied)).

**69.** *See, e.g., S. Steel Co. v. Consolidated Eng'g,* 677 S.W.2d 97, 103 (Tex.App.San Antonio 1984), *rev'd on other grounds,* 699 S.W.2d 188 (Tex.1985); *Smallwood v. Singer,* 823 S.W.2d 319, 321 (Tex.App.-Texarkana 1991, no writ).

**70.** *S. Steel Co.,* 677 S.W.2d at 103; *see also Smallwood,* 823 S.W.2d at 321.

**71.** *S. Steel,* 677 S.W.2d at 103.

**72.** 49 DAVID R. DOW & CRAIG SMYSER, TEXAS PRACTICE: CONTRACT LAW § 9.4 (2010).

**73.** *Id.*

**74.** *Id.*

**75.** *See, e.g., Hernandez v. Gulf Group Lloyds,* 875 S.W.2d 691, 692 (Tex.1994); *Kaiser v. Nw. Shopping Ctr., Inc.,* 587 S.W.2d 454, 457 (Tex.Civ.App.-Dallas 1979, writ ref'd n.r.e.); *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195 (Tex.2004); *Hovorka v. Cmty. Health Sys.,* 262 S.W.3d 503, 509 (Tex.App.-El Paso 2008, no pet.).

**76.** *Smallwood,* 823 S.W.2d at 321 ("If the failure of consideration, or what might be characterized as a failure of partial performance, is a material breach of contract, the other party has a right to sue for a total breach or to elect to continue performance and sue for a partial breach."); *TGI Friday's Inc. v. Great Nw. Rests.,* 652 F.Supp.2d 763, 769 (N.D.Tex.2009)("Under Texas law ... if a defendant believed that [the plaintiff] breached the contract, it had two options: continue to perform the contract and sue for partial

party is *not* excused from future performance and may sue only for the damages caused by the breach.[77] Thus, the primary distinction between a material breach and an immaterial breach is that only a material breach excuses the non-breaching party from future performance.[78]

### ii. Texas Law Governing Contractual Remedies

■■■ "In the event of a breach a party to contract can pursue any remedy which the law affords in addition to the remedy provided in the contract, unless the contract declares the remedy to be exclusive."[79] Therefore, although Texas law permits a non-breaching party to cease performance under a contract and/or sue for damages as recourse for a contractual breach, parties to an agreement may nevertheless contractually specify the remedies available to redress a breach of contract, thereby modifying the legal and equitable remedies outlined above.[80] The remedies provided in a contractual agreement may therefore be permissive or exclusive.[81] An exclusive remedy precludes other remedies, and a permissive remedy does not preclude other remedies.[82] However, the mere fact that the contract includes a particular remedy does not mean that such remedy is exclusive.[83] Accordingly, the Court may not construe a remedy specified in the contract as exclusive unless the parties have indicated or declared clearly their intent that it be exclusive.[84]

### iii. The Court's Harmonization

■■■ In this case, Paragraphs 14(b) and 15(b) can be harmonized if the contractual terms "default" and "breach" are given different meanings that denote the difference between a material breach and an immaterial breach. Alltech denies that the terms should be given different meanings. Myriad, however, concedes that "the Apprise and AIMS Agreements use the terms to refer to distinct scenarios in which distinct remedies are available."[85] A rule of contractual interpretation dictates that "[w]hen parties use different language in

breach, or cease performance and treat the contract as terminated."); *Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877, 887–88 (Tex.App.San Antonio 1996, writ denied)("Where one party materially breaches a contract, the non-breaching party is forced to elect between two courses of action-continuing performance or ceasing performance.").

77. *See, e.g., Hernandez*, 875 S.W.2d at 693; *Hanson Prod. Co. v. Ams. Ins. Co.*, 108 F.3d 627, 630–31 (5th Cir.1997)(discussing Texas law); *S. Steel Co.*, 677 S.W.2d at 103.

78. *See, e.g., Solis v. Universal Project Mgmt., Inc.*, No. H–08–1517, 2009 WL 2018260, at *5 (S.D.Tex. July 6, 2009)("Texas law is ... clear that only a material breach excuses the non-breaching party's performance; an immaterial breach does not."); *S. Steel Co.*, 677 S.W.2d at 103.

79. *Tabor v. Ragle*, 526 S.W.2d 670, 676 (Tex. Civ.App.Fort Worth, writ ref'd n.r.e.).

80. *SAVA gumarska in kemijska industria d.d. v. Advanced Polymer Sciences, Inc.*, 128 S.W.3d 304 (Tex.App.Dallas 2004, no pet.).

81. *Pelto Oil Corp. v. CSX Oil & Gas Corp.*, 804 S.W.2d 583, 586 (Tex.App.Houston [1st Dist.] 1991, writ denied).

82. 49 David R. Dow & Craig Smyser, Texas Practice: Contract Law § 10.3 (2010).

83. *Id.*; *Bifano v. Young*, 665 S.W.2d 536, 539 (Tex.App.-Corpus Christi 1983, writ ref'd n.r.e.).

84. *Vandergriff Chevrolet Co. v. Forum Bank*, 613 S.W.2d 68, 70 (Tex.App.Fort Worth 1981, no writ).

85. Myriad's Reply (Dkt. No. 515) at p. 4. Myriad agrees, but for different reasons discussed above, that "the provisions at issue can and should be harmonized by giving different meaning to 'default' and 'breach' as to available remedies."

different parts of a contract, [the court] may ordinarily assume that they intended different things."[86] As such, the fact that the parties chose to use different terms in connection with the different remedies available indicates that the parties intended "default" and "breach" to have different meanings.[87] Indeed, this Court has spent an inordinate amount of time attempting to harmonize Paragraphs 14(b) and 15(b), and these substantial efforts have produced only one conclusion—that the only way Paragraphs 14(b) and 15(b) can be reconciled is to give "default" and "breach" different meanings.

Paragraphs 14(b) and 15(b) can be harmonized if the term "default"—as used in Paragraph 14(b)—means "material breach" and the term "breach"—as used in Paragraph 15(b)—means "immaterial breach." Under this interpretation, if a "default"—*i.e.* a material breach—occurred, Paragraph 14(b) gave—similar to Texas law—Myriad the right either to: (1) treat the material breach as a total breach and cease performance under the contract, or (2) treat the material breach as a partial breach, continue performance under the contract, and sue for the damages caused by the breach as permitted under Paragraph 15(b). Myriad's ability to elect a remedy is indicated by Paragraph 14(b)'s use of the permissive term "may."[88] Termination of a contract is permitted, but not required, when a contract provides that one party "may terminate" the contract.[89]

**86.** *In re Wilmer Cutler Pickering Hale and Dorr LLP*, No. 05–08–01395–CV, 2008 WL 5413097, at *4 (Tex.App.-Dallas Dec. 31, 2008, orig. proceeding [mand. denied] ).

**87.** The Court has thoroughly researched the issue of whether "default" and "breach" are synonymous. The Court located at least four opinions from Texas courts of appeals (and one from a sister district court) that indicate the terms "breach" and "default" can have the same meaning. *See Bradford Partners II, L.P. v. Fahning*, 231 S.W.3d 513, 520 (Tex.App.Dallas 2007, no pet.); *Limestone Grp., Inc. v. Sai Thong, L.L.C.*, 107 S.W.3d 793, 797 (Tex.App.Amarillo May 27, 2003, no pet.); *Alaniz v. Yates Ford, Inc.*, 790 S.W.2d 38, 40 (Tex.App.San Antonio 1990, no writ)("the term 'default' can mean 'omission,' 'failure,' or even 'breach' in everyday usage"); *Easterwood v. Willingham*, 47 S.W.2d 393, 395 (Tex.Civ.App.-Easterwood 1932)("The term 'default' may be defined as a failure of a party to perform a legal duty."); *T–M Vacuum Prods., Inc. v. TAISC, Inc.*, No. A. H–07–4108, 2008 WL 2078190, at *6 (S.D.Tex. May 15, 2008)("The plain meaning of the term includes breach.").

However, each of the foregoing cases is distinguishable from this case. In particular, none of the above cases examined a contract that contained both terms—"breach" and "default." *Id.* Rather, each of the cited cases provided interpretations of contracts that only contained the single term "default." *Id.* The contract in this case is distinguishable in that it contains both terms—"default" and "breach." Therefore, this Court does not in any way dispute the conclusions of the Texas appellate courts that the term "default" can include "breach." Rather, reviewing the particular contract at issue in this case, the Court merely concludes that these two terms have different meanings in this particular contract.

**88.** *See e.g., Van–Tex, Inc. v. Pierce*, 703 F.2d 891, 899 (5th Cir.1983)(recognizing that term "may" is permissive).

**89.** *See Insta/Com, Inc. v. Aetna Cas. & Sur. Co.*, 589 S.W.2d 494, 495 (Tex.Civ.App.Dallas 1979, no writ)("[appellant] argues that it had no obligation to terminate its contract . . . upon default because the words 'may immediately terminate' are permissive in nature and are not compulsory. We agree . . . the words 'may immediately terminate' must be taken in their natural and ordinary sense; that is, as allowing, but not requiring, termination . . ."); *McCarty v. Montgomery*, 290 S.W.3d 525, 535 (Tex.App.Eastland 2009, pet. denied)(explaining that termination is described permissively because the contract provided that "Buyer may terminate this contract."); *Lee–Emmert v. Macatee, Inc.*, 410 S.W.2d 489, 490 (Tex.Civ.App.-Dallas 1966, no writ)(explaining that "the right of appellant to cancel the contract is permissive in character. It does not have the effect of limiting appellant to the remedy of cancellation."); *Spinal Con-*

Therefore, Myriad was permitted to cancel the contract in the event of a material breach as provided in Texas common law, but Myriad was not required to cancel the contract.

The one major difference from Texas law is that if Myriad opted to treat the breach as a total breach and cancel the contract then Myriad could not thereafter sue for damages. Rather, once Myriad elected to cancel the contract, Paragraph 14(b) limits Myriad's remedy to cancellation.[90] Under Texas law, this limitation of liability provision is permitted.[91]

Conversely, Paragraph 15(b) applies if Alltech committed an immaterial breach or if Myriad opted to treat Alltech's breach as immaterial. Under Paragraph 15(b), Myriad did not have the option to cancel the contract. Instead, Myriad was required to continue performing under the contract, but Myriad could "pursue any action or other remedy . . ." for the partial breach. The fact that Paragraph 15(b) only allows Myriad—and not Alltech—to seek monetary damages for a partial breach harmonizes with the portion of Paragraph 11(b) that forecloses Alltech from recovering "any direct, indirect, special, incidental, consequential, punitive or exemplary damages or losses, including, without limitation, lost profits, downtime costs, labor cost, overhead costs . . ." [92]

■ Finally, it is important to note that Paragraph 14(b) provides that "cancellation shall be the sole remedy available to either party in the event of a default." [93] The Court acknowledges that "language such as 'exclusive' or 'sole' remedy are an indication of an exclusive remedy." [94] And standing alone, the final sentence of Paragraph 14(b) does indicate that the parties intended cancellation to be the parties' exclusive remedy for any "default." The Court, however, is not permitted to view this one sentence in isolation. In determining the intent of the parties, the general rule is that every clause must be given effect with a view toward what is objectively stated rather than what is subjectively meant by the parties.[95] Under this general rule, the Court must therefore examine and give effect to Paragraph 15(b)'s mandate that "Nothing herein shall preclude

---

cepts, Inc. v. Curasan, AG, No. 3:06–CV–0448–P, 2006 WL 2577820, at *5 (N.D.Tex. Sept. 7, 2006)(explaining that the use of the phrase "may terminate," inter alia, "reflects the Parties' intent to make the remedy optional."); Cf. Retractable Technologies Inc. v. Abbott, 281 Fed.Appx. 275, 276 (5th Cir.2008)(concluding that an arbitration provision in a contract was permissive but not mandatory because the provision provided that "the parties 'may' rather than 'shall' have their disputes resolved by this procedure.").

90. See Lytz v. Whaley, No. 09–07–371 CV, 2008 WL 2917125, at *2 (Tex.App.Beaumont July 31, 2008, no pet.)("The contract limited the remedial rights of the parties . . . where the buyer elected to terminate the contract-to the parties' release from the contract. Once chosen by the buyer, the provision in the contract was clearly intended to be an exclusive remedy resulting in a cancellation of the contract and release of all parties.").

91. See Tiger Truck, LLC v. Bruce's Pulp & Paper, LLC, 282 S.W.3d 176, 183–84 (Tex.App.Beaumont 2009, no pet.)("In the absence of fraud, a contract that authorizes cancellation without penalty will be enforced as it is written.").

92. Trial Ex. D264(APPRISE Agreement) at ¶ 11(b); Trial Ex. D225 (AIMS Agreement) at ¶ 8(b).

93. Trial Ex. D264(APPRISE Agreement) at ¶ 14(b)(emphasis added); Trial Ex. D225 (AIMS Agreement) at ¶ 10(b).

94. McCarty v. Montgomery, 290 S.W.3d 525, 535 (Tex.App.Eastland 2009, pet. denied).

95. See, e.g., Vandergriff Chevrolet Co., Inc. v. Forum Bank, 613 S.W.2d 68, 70–71 (Tex.Civ. App.Fort Worth 1981, no writ) (citations omitted).

Myriad from pursuing any action or other remedy for any breach or threatened breach of this Agreement, all of which remedies shall be cumulative."[96] By including this provision, the parties did not indicate or declare clearly their intent that cancellation shall always be the exclusive remedy.[97] Consequently, the Court is not permitted to construe the remedy specified in Paragraph 14(b) as exclusive, except under the circumstances outlined above.[98] Additionally, Paragraph 14(b)'s use of the permissive term "may" is further indication that Paragraph 14(b) does not provide an exclusive remedy except under the circumstances outlined above.

### d. Myriad Cannot Recover Contractual Damages Under Either the AP-PRISE Agreement or the AIMS Agreement

 Applying this interpretation to the evidence presented at trial, the Court concludes that Myriad may not recover any lost profits under either the APPRISE or AIMS Agreements because the evidence at trial revealed that Myriad opted to cancel both contracts. The jury found that Alltech materially breached both the AP-PRISE and AIMS Agreements. Yet, on March 28, 2008, Chris Roussel, CEO of Myriad, sent a letter to Hugh Inglis entitled "Notice Of Termination Of the AP-PRISE Agreement."[99] In the letter, Mr. Roussel "advised that, pursuant to section 14(b), Myriad Development Inc. is terminating the APPRISE Agreement as a re-

sult of Alltech's use of Myriad's intellectual property to develop a competing software application in breach of Sections 9 (Ownership) and 13 (Confidentiality)."[100] Myriad could have continued performing and sought damages for the breach. Instead, Myriad elected to cancel the contract. Consequently, Paragraph 14(b) of the AP-PRISE Agreement dictates that cancellation is Myriad's sole remedy.

Likewise, Mr. Roussel sent Alltech a letter on May 30, 2008, entitled "Cancellation of the Master Agreement AIMS Hosting, Development and Systems Interface ("Agreement") for Breach"[101] The letter stated, "Please find this notice of cancellation of the Agreement as a result of the material breach by Alltech of its obligations under Sections 6(c) and 9(a) of the Agreement with regard to the intellectual property contained in Myriad's APPRISE System."[102] Again, by sending this letter and ceasing performance, Myriad elected to cancel the contract. Paragraph 15(b) of the AIMS Agreement therefore dictates that cancellation is Myriad's sole remedy.

### 3. Unpaid Amounts Under APPRISE Agreement

 Myriad is only entitled to recover $21,623 for unpaid amounts under the AP-PRISE Agreement. In answer to Interrogatory No. 1G, the jury awarded Myriad: (1) lost profits under the APPRISE Agreement in the amount of $1 million, and (2) "unpaid amounts under the AP-PRISE Agreement" in the amount of

---

96. Trial Ex. 264 (APPRISE Agreement) at ¶ 15(b); Trial Ex. D225 (AIMS Agreement) at ¶ 11(b).

97. *See, e.g., Vandergriff Chevrolet Co., Inc.,* 613 S.W.2d at 70–71 (citations omitted).

98. *Id.*

99. *See* Trial Ex. D600. This exhibit was one of the hundreds of agreed exhibits admitted into evidence on the first day of trial. *See* Clerk's

Dkt. No. 427 (List of Agreed Exhibits Admitted Into Evidence) at 2nd p. 51.

100. *Id.*

101. Trial Ex. D604. This exhibit was also one of the hundreds of agreed exhibits admitted into evidence on the first day of trial. *See* Clerk's Dkt. No. 427 (List of Agreed Exhibits Admitted Into Evidence) at 2nd p. 52.

102. *Id.*

$647,000.00. Alltech correctly contends, *inter alia,* that "the dollar amount allocated by the jury for unpaid amounts is at a variance with ... the evidence ..." [103] According to Alltech, Myriad is only entitled to recover $21,263.00 in unpaid obligations under the Apprise Agreement.[104] In response, Myriad now maintains that "the jury found that Myriad had lost profits totaling $1,000,000 in 2008 and 2009 and that Myriad was entitled to unpaid amounts, that is, amounts Alltech would have paid Myriad if the contract had been performed in 2010, of $647,000." [105]

■ Myriad is incorrect that "unpaid amounts" can be defined as "amounts Alltech would have paid Myriad if the contract had been performed in 2010." [106] Myriad's definition of "unpaid amounts" actually defines lost profits. Under Texas law, lost profits are expectation damages that compensate Myriad for the amount of profits Myriad would have earned in the future had the contract not been breached.[107] Indeed, the jury was specifically instructed that "[o]ne measure of damages for breach of contract is that amount of damages which restores the injured party to the economic position it would have enjoyed if the contract had been performed. This measure may include reasonably certain lost profits ... Lost profits may be in the form of direct damages, that is profits lost on the contract itself ..." [108] Likewise, Myriad's own expert, Mr. Gallagher, defined lost profits as "the profits ... that Myriad would have made had they continued to sell the services to Alltech." [109] Also relevant to Myriad's argument, the jury was further instructed to consider lost profits through September 30, 2010.[110]

In contrast, "unpaid amounts" compensate Myriad for the amounts that Alltech already owed to Myriad on the date of the breach in March 2008 for work Myriad performed prior to the breach. At trial, Mr. Gallagher provided the following testimony on direct examination:

Q: Okay. Mr. Gallagher, can you tell me what P–1560 is.

A: Sure. These are the three categories of damages that we're going to be talking about here today.

Q: Okay.

A: Broad categories.

Q: Can you explain the various components of damages that you have here?

103. Alltech Court–Ordered Brief (Dkt. No. 507) at p. 8.

104. *Id.* at p. 9.

105. *See* Myriad's Reply (Dkt. No. 464) at p. 3.

106. *See* Myriad's Mot. (Dkt. No. 433) at p. 2; Myriad's Reply (Dkt. No. 464) at p. 3.

107. *See Intercont'l Grp. P'ship v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 666 (Tex. 2009)("Breach of contract damages include lost profits (expectancy), out-of-pocket expenses (reliance), and restitution; most litigants pursue only lost profits as that is normally the largest measure."); *Tex. Energy Innovation, Inc. v. Hino Elec. Power Co., Inc.,* No. 03–07–001–CV, 2010 WL 521033, at *4 (Tex.App.Austin Feb. 12, 2010, no pet.) ("whether a plaintiff has incurred any lost profits is determined by subtracting a plaintiff's operating expenses from the gross profits the plaintiff would have earned under a contract had the defendant not breached."); *Qaddura v. Indo–European Foods, Inc.,* 141 S.W.3d 882, 888–89 (Tex.App.Dallas 2004, pet. denied) (expectation damages are benefit of the bargain damages that restore the non-breaching party to the same position it would have been in had the contract not been breached).

108. *See* Jury Instructions 26a and 26d (Dkt. No. 416) at p. 37.

109. *Id.* at 78:6–12.

110. *See* Jury Instruction 26e (Dkt. No. 416) at p. 38.

**A:** Sure. The first category, the top line, the 202,311, Myriad sent invoices to Alltech for work that Myriad had done prior to the break-up, and Alltech hasn't paid those fees or amounts. Myriad's provided copies of the invoices and the time sheets and things like that, at least to my knowledge I don't think there's any dispute about the numbers; it's just that, I guess, Alltech believes they don't owe that amount of money, so.[111]

Thus, Myriad's own expert defined "unpaid amounts" as those amounts Alltech owed Myriad "for work that Myriad had done prior to the break-up, and Alltech hasn't paid . . ."[112]

Applying the proper definition of "unpaid amounts," the evidence Myriad presented at trial demonstrates that Myriad was not entitled to recover $647,000 in unpaid amounts under the APPRISE Agreement. Specifically, Schedule 1 of Mr. Gallagher's expert report provides a "Summary of Economic Damages."[113] Schedule 1 indicates that Myriad sought to recover three categories of damages: (1) past unpaid obligations; (2) lost enterprise value; and (3) direct lost profits.[114] Sched-

ule 1 states that Myriad suffered $202,311 in damages for "past unpaid obligations."[115] Schedule 4 then provides a detailed accounting of the "Monies due to Myriad for Unpaid Obligations."[116] Mr. Roussel confirmed during his re-direct examination that Schedule 4 gives a proper accounting of "unpaid obligations."[117] According to Schedule 4, Alltech owed: (1) $198,110 in unpaid amounts under the Subcontract for Labor, and (2) $21,623 in unpaid amounts under the APPRISE Agreement.[118] The fact that Schedule 4 provides the proper amount of unpaid amounts under each agreement is further represented by the fact that the jury found: (1) Alltech owed Myriad $198,110.00 in unpaid amounts under the Subcontract for Labor; and (2) Alltech did not owe Myriad any unpaid amounts under the AIMS Agreement.[119] Both of these factual findings are exact restatements of the amounts listed in Schedule 4.

Notably, Myriad relies upon lines 10 and 15 of Schedule 2.1 as support for its arguments.[120] However, line 10 of Schedule 2.1 provides an accounting for "Lost Revenues."[121] Line 15 of Schedule 2.1 provides an accounting for "Total Discounted Lost Profits."[122] Clearly, both of these sources

---

111. March 2, 2010 Trial Testimony, Vol. 2 (Dkt. No. 445) at 67:25–68:16.

112. *Id.* at 68:9–11.

113. Trial Exhibit P–1560 at Schedule 1.

114. *Id.* at Schedule 1, lines 1–3.

115. *Id.* at Schedule 1, line 1.

116. *Id.* at Schedule 4.

117. March 2, 2010 Trial Testimony, Vol. 2 (Dkt. No. 445) at 256:24–257:8.

118. *See* Trial Ex. P–1560 at Schedule 4, lines 1 and 3. Schedule 4 also indicates that Myriad was still in receipt of $17,422 that Alltech had prepaid under the AIMS Agreement but

never used. *Id.* at Schedule 4, line 2. Accordingly, after subtracting Alltech's $17,422 credit, Alltech owed Myriad a total of $202,311 in unpaid amounts under the APPRISE Agreement and the Subcontract for Labor. Id. at Schedule 4, line 4. However, as indicated, only $21,623 were attributable to unpaid amounts under the APPRISE Agreement.

119. *See* Jury Interrogatory No. 2G (Dkt. No. 428) at p. 16; Jury Interrogatory No. 3E (Dkt. No. 428) at p. 22; *See also supra* n. 118.

120. *See* Myriad's Reply (Dkt. No. 464) at p. 3 (citing Trial Exh. P–1560, Sch. 2.1, lines 10 and 15).

121. Trial Ex. P–1560 at Schedule 2.1, line 10.

122. *Id.* at line 15.

provide calculations for lost profits, not unpaid amounts.

In sum, the evidence presented at trial directly contradicts the jury's award of $647,000.00 for unpaid amounts under the APPRISE Agreement. Viewing all of the evidence in the light most favorable to Myriad, including but not limited to Plaintiff's Exhibit P–1560, the evidence conclusively reveals that Myriad is only entitled to recover $21,263.00 for unpaid amounts under the APPRISE Agreement. Alltech does not dispute that Myriad is entitled to recover unpaid amounts under the AP-PRISE Agreement, and the Court agrees that Paragraph 14(b) does not preclude Myriad from recovering unpaid amounts under the APPRISE Agreement.

### 4. Sufficient Evidence Of Reasonable Royalty Damages

■ Contrary to Alltech's assertion, the jury's verdict on reasonable royalty damages must stand. As compensation for Alltech's misappropriation of Myriad's trade secrets, the jury awarded damages calculated as reasonable royalty. The reasonable royalty amount awarded represents the amount that Myriad and Alltech would have agreed to as a fair price for licensing Myriad's trade secrets. In closing arguments, Alltech's counsel described the $250,000 licensing fee as "the only number that has any reliability you've heard during trial as to what [Myriad's] system is worth."[123] Alltech, however, now contends that Myriad may not recover $250,000.00 in reasonable royalty damages for two primary reasons. First, Alltech maintains that there is no evidence of such damage in the record. Second, Alltech asserts that the royalty damages were not determined as of the date of misappropriation as required.

■ "In an action for trade secret misappropriation, the plaintiff can recover actual damages based on the value of what has been lost by the plaintiff or the value of what has been gained by the defendant."[124] Reasonable royalty represents the value of what a defendant has gained as a result of the misappropriation.[125] The Fifth Circuit has explained that:

To adopt a reasonable royalty as the measure of damages is to adopt and interpret, as well as may be, the fiction that a license was to be granted at the time of beginning the infringement, and them to determine what the license price should have been. In effect, the court assumes the existence ab initio of, and declares the equitable terms of, a supposititious license, and does this nunc

123. March 5, 2010 Trial Transcript, Vol. 5 (Dkt. No. 447) at 104:1–6.

124. *Carbo Ceramics, Inc. v. Keefe*, 166 Fed. Appx. 714, 722 (5th Cir.2006)(citing *Univ. Computing Co. v. Lykes–Youngstown Corp.*, 504 F.2d 518, 536 (5th Cir.1974)); *See also Taco Cabana Intern., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1128 (5th Cir.1991)("Trade-secret misappropriation damages typically embrace some form of royalty.").

The Fifth Circuit has also instructed that "normally the value of the secret to the plaintiff is an appropriate measure of damages only when the defendant has in some way destroyed the value of the secret.... Where the plaintiff retains the use of the secret, as

here, and where there has been no effective disclosure of the secret through publication the total value of the secret to the plaintiff is an inappropriate measure." *University Computing Co.*, 504 F.2d at 535. In this case, Myriad did not present any evidence that Alltech destroyed the value of its trade secrets. Accordingly, the jury was correct in not awarding lost profits for Myriad's trade secret misappropriation claim.

125. *See Carbo Ceramics*, 166 Fed.Appx. at 723 (delineating the three methods for measure what the defendant has gained as a result of the misappropriation); *Univ. Computing Co.*, 504 F.2d at 536 (explaining that reasonable royalty is a "second technique" for measuring the value of the secret to the defendant).

pro tunc; it creates and applies retrospectively a compulsory license ...[126] This fictitious royalty "is calculated based on what a willing buyer and seller would settle on as the value of the trade secret."[127] "The cases allow a plaintiff considerable flexibility in establishing a reasonable royalty," but the calculation may not be based upon sheer speculation.[128]

Based on the foregoing authority, the jury was instructed that the proper measure of reasonable royalty is to calculate what Myriad and Alltech would have agreed to as a fair price for licensing Alltech to put the trade secrets to the use Alltech intended at the time the misappropriation took place.[129] Pursuant to well-established Fifth Circuit precedent, the jury was further instructed to consider the following factors in calculating a reasonable royalty: (1) the resulting and foreseeable changes in the parties' competitive posture; (2) prices past purchasers or licensees may have paid; (3) the total value of the secret to Myriad, including Myriad's development cost and the importance of the secret to Myriad's business; (4) the nature and extent of the use Alltech intended for the secret; and (5) whatever other unique factors in the particular case might have been affected by the parties' agreement, such as the ready availability of alternative process.[130]

At trial, the parties presented ample evidence on each of the above factors. To begin, Mr. Roussel provided testimony that addressed the first factor—the resulting and foreseeable changes in the parties' competitive posture—and the fourth factor—the nature and extent of the use Alltech intended for the secret:

> **Q:** What has been the impact on Myriad of Alltech's actions in using Myriad's intellectual property to build this replacement system?
>
> **A:** Well, essentially they've taken our trade secrets and they've taken us out of the government market. They've taken our trade secrets to use and supply the service to the government market we were providing.[131]

Alltech and Myriad initially started in a non-competitive posture, but after Alltech's development of a replacement system, the parties eventually ended in a *de facto* competitive posture.

Specifically, the evidence revealed that Myriad first became involved with Alltech in 2002.[132] Alltech's insurance inspection division licensed Risk Manager from 2002–2005.[133] In 2005, at the end of a five-year contract with FEMA, Alltech's FEMA division was looking to implement more advanced software for its next FEMA bid.[134]

126. *Univ. Computing Co.*, 504 F.2d at 537 (quoting *Egry Register Co. v. Standard Register Co.*, 23 F.2d 438, 443 (6th Cir.1928)).

127. *Carbo Ceramics, Inc.*, 166 Fed.Appx. at 723.

128. *Rorie v. Edwards*, 48 Fed.Appx. 102, 2002 WL 31016457, at *3 (5th Cir. Aug. 13, 2002).

129. *See* Jury Instruction No. 28 (Dkt. No. 416) at p. 40; *See also Molex, Inc. v. Nolen*, 759 F.2d 474, 480 (5th Cir.1985)("The trial court correctly instructed the jury that it could award damages ... on the 'reasonable royalty' theory.").

130. *See* Jury Instruction No. 28 (Dkt. No. 416) at p. 40; *See, e.g., Carbo Ceramics, Inc.*, 166 Fed.Appx. 714 (delineating the same five well-established factors).

131. March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 174:24–175:5.

132. *Id.* at 135:13–18.

133. *Id.*

134. *See* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 29:15–30:12 and 33:18–34:12.

On June 6, 2005, in preparation for its next FEMA bid, Alltech licensed a customized version of Myriad's Risk Manager system.[135] On June 30, 2005, Alltech hired Myriad to develop the AIMS program to replace Alltech's prior software.[136]

Almost a year later, in June 2006, Alltech asked Myriad to be a part of Alltech's team to bid for a FEMA contract inspecting damage from Hurricane Katrina.[137] Myriad agreed to become a member of Alltech's bidding team, but Myriad refused to sign Alltech's proposed "Teaming Agreement" because the agreement gave Alltech all rights, title, and interest to the Myriad's AIMS PB Ace software.[138] Alltech bid for but did not win the FEMA contract.[139] In September 2006, FEMA permitted Alltech to re-bid.[140] In December 2006, Myriad and Alltech signed a Teaming Agreement, which unlike the first Teaming Agreement, gave Myriad complete ownership of the AIMS and Risk Manager software.[141] In its re-bid, Alltech "touted Myriad's Risk Manager product."[142] On March 30, 2007, Alltech informed Myriad that their team won the FEMA re-bid.[143] The undisputed evidence showed that Alltech paid Myriad millions of dollars in fees from the FEMA contract.[144] Myriad made 1.3 million in revenue from the inspection fees alone.[145]

Alltech's actions in copying Myriad's system and software placed Alltech in competition with Myriad for the FEMA inspection fees. Alltech admits that it developed an interface system and storage database for use with its FEMA contract.[146] Once implemented, Alltech used its own system to perform all the work Myriad previously performed for FEMA.[147] As a result, Alltech retained the inspection transaction fees and license fees that Alltech would have otherwise been required to pay to Myriad under the APPRISE Agreement.[148]

135. *Id.* at 39:1–18.

136. *Id.* at 30:13–16 ("the AIMS program . . . was a replacement for our existing software.").

137. March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 141:20–142:3.

138. *Id.* at 144:1–21; *See also* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 55–57 (Hugh Inglis' explanation of a "Teaming Agreement").

139. March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 143:17–144:23; *See also* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 99:13–17 ("That's correct, we were not selected as one of the two contractors.").

140. *See* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 103:7–11.

141. March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 146:12–147:7.

142. *Id.*

143. *Id.* at 145:4–147:19; *See also* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 100:3–104:5.

144. *See* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 110:15–11:25.

145. *Id.* at 82:3–7.

146. *Id.* at 52:14–54:2 (Hugh Inglis explained that "Aries" was created to replace Myriad's AIMS system and Pegasus was created to replace Myriad's RISK Manager system); *See also* March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 26:14–22 (Myriad's expert, Robert Young, testified that Pegasus "does contain features and functions and ideas that were—that came from the Risk Manager system," which the jury was entitled to believe).

147. *See* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 52:14–54:2 (Hugh Inglis explained that Alltech did eventually use its Pegasus system in the field).

148. *Id.* at 86:2–10(explaining that after the termination Alltech no longer paid Myriad a $2.40 per inspection fee).

Alltech also elicited testimony during cross-examination regarding the second factor-prices past purchasers or licensees may have paid. Chris Roussel provided the following testimony on cross-examination:

**Q:** Mr. Roussel, there was a time when you were going to divide up your company and because of these entities didn't want any of the government business or whatever, but you were going to license Risk Manager back to one of the entities. Do you recall that?

**A:** ... ISO, when we did not get the Alltech FEMA award in 2006 said, "Well, how about the insurance and mortgage businesses, can we move forward and purchase that?"

**Q:** And you were going to license Risk Manager back to them, correct?

**A:** I was going to—what we had talked about is, Myriad's insurance and mortgage services would become part of ISO and we would leave a Myriad entity there to continue to provide its government services, since we thought—

**Q:** And you were going to license back Risk Manager to them; correct?

**A:** And that's correct. We were going to license that back to government entity.

**Q:** And you had agreed that you would license it to them for $250,000 a year; correct?

**A:** That is correct.

**Q:** And so that—you placed that yourself. You placed the value on what Risk Manager was worth to your company at that time; correct?

**A:** That's not correct. We said that the new Myriad would license it to the Myriad government for $250,000, so they could continue on the contracts that they had.[149]

This testimony was particularly relevant to the jury's necessary inquiry regarding the amount Myriad and Alltech would have agreed to as a fair licensing price for Alltech to put Myriad's trade secrets to the use Alltech intended at the time the misappropriation took place. As noted, Alltech used Pegasus/DSD in order to conduct property inspections for FEMA under the 2007 "PRIME Agreement."[150] As of the trial in this case, the FEMA Prime Agreement was scheduled to run until September 30, 2010.[151]

In comparison, the "new Myriad" intended to use the Risk Manager and PB Ace systems in order to complete its obligations to Alltech under the APPRISE Agreement, AIMS Agreement, and any FEMA Agreements Alltech obtained after 2005.[152] Thus, considering the exactitude in purpose and timing of the two licenses,

---

149. March 2, 2010 Trial Transcript, Vol. 2 (Dkt. No. 445) at 257:15–258:18. Likewise, Myriad's damages expert witness, Mark Gallagher, provided the following testimony during cross-examination:

**Q:** What was ISO going to do with the government line if it bought Myriad?
**A:** I think they said their though was they were going to license it out. There was some discussion about licensing revenue from it.
**Q:** For how much?
**A:** I think it was about $250,000 a year, if I remember.
*Id.* at 101:9–16.

150. *See* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 52:14–54:2 (Hugh Inglis explained that "Aries" was created to replace Myriad's AIMS system and Pegasus was created to replace Myriad's RISK Manager system);

151. *Id.* at 20:6–12 (explaining duration of FEMA contracts).

152. The testimony at trial only revealed two government-related contracts in 2006—the APPRISE Agreement and the AIMS Agreement. Both agreements related to Alltech's anticipated work for FEMA. Both Agreements became effective in June 2005 and scheduled to remain in effect until at least June 2008.

the jury was entitled to conclude that the amount the "new Myriad" was willing to license Risk Manager from ISO was congruent to the amount Alltech may have been willing to license Risk Manager from Myriad.

Alltech complains that "the only testimony was from Roussel as a willing seller, who, without testimony concerning what a willing buyer would pay, might just as well have testified that he was ready, willing and able to license his system for $1 billion."[153] Contrary to Alltech's argument, Mr. Roussel provided testimony about what a willing buyer and seller would agree to as a reasonable licensing price. Mr. Roussel explained that ISO proposed to purchase Myriad's insurance and mortgage businesses, and Myriad would continue to exist as a "government services" business. The $250,000 represented what the new Myriad—the buyer—was willing to pay to ISO and the amount ISO—the seller—was willing to accept from Myriad.

The Court is also not persuaded by Alltech's argument that "Myriad's attempt to attribute the value of a 2006 license to the value of the trade secrets which were allegedly misappropriated in 2008 runs afoul of 'the principle requiring the valuation of trade secrets [to be] measured at the time of the alleged misappropriation.' "[154] This Court agrees that "the proper measure is to calculate what the parties would have agreed to as a fair price for licensing the defendant to put the trade secret to the use the defendants intended at the time the misappropriation took place."[155] However, this rule does not preclude the jury from considering evidence of a licensing fee agreed to in 2006. Indeed, numerous Fifth Circuit panels have instructed that the trier of fact should consider "prices *past* purchasers or licensees may have paid."[156] Furthermore, as explained above, both licenses—the new Myriad's license from ISO

---

The APPRISE Agreement became effective on June 6, 2005. The term of the Apprise Agreement was three (3) years from the effective date of June 6, 2005, or stated differently, until June 6, 2008. The Apprise Agreement further provided that the contract would "automatically renew for consecutive one (1) year renewal terms ("Renewal Term") unless terminated by either party upon sixty (60) days prior written notice prior to the expiration of the initial year of the Initial Term, the Initial Term or any Renewal Term." Likewise, the term of the AIMS Agreement was one (1) year from the effective date of June 30, 2005, or stated differently, until June 30, 2005. The AIMS Agreement further provided that the "Agreement shall automatically renew for consecutive one (1) year renewal terms ("Renewal Term") unless terminated by either party upon sixty (60) days prior written notice prior to the expiration of the initial year of the Initial Term, the Initial Term, or any Renewal Term." It appears that the parties allowed both contracts to automatically renew through 2008.

Mr. Roussel discussed two other government contracts, but neither of those contracts were effective in 2006. First, Myriad secured a direct contract with FEMA in 2005, but that contract only lasted for five months. *See* March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 235:19–22 ("We worked with Alltech to secure a separate contract with FEMA and for about five months we provided verification in '05. And men in '06, we did the same service again through Alltech"). Second, from August 2007 until December 2007, Myriad *attempted to execute a contract with* the Florida Department of Financial Services (My Safe Program), but the State of Florida did not approve the contract. *Id.* at 219:11–221:11.

153. Alltech's Sur–Reply (Dkt. No. 466) at p. 7.

154. Alltech's Resp. (Dkt. No. 449) at p. 13 (quoting *Alcatel USA, Inc. v. Cisco Systems, Inc.*, 239 F.Supp.2d 660, 670 (E.D.Tex.2002)).

155. This assertion is well-established under Fifth Circuit precedent. *See, e.g., Univ. Computing Co.*, 504 F.2d at 537.

156. *Univ. Computing Co.*, 504 F.2d at 539 (italics added); accord *Carbo Ceramics, Inc.*, 166 Fed.Appx. at 723; *Rorie v. Edwards*, 48 Fed.Appx. 102, ——, 2002 WL 31016457, at *3 (5th Cir. Aug. 13, 2002); *Metallurgical*

and Alltech's hypothetical license from Myriad—were meant to service the same contract with FEMA in 2007. Thus, a licensing fee calculated in 2006 was an apt comparison. Equally important, Myriad presented evidence that the misappropriation began in 2007.[157]

Mr. Roussel also provided testimony that specifically addressed both facets of the third factor. Specifically, during direct examination, Mr. Roussel provided testimony regarding the total value of the secret to Myriad, including Myriad's development cost and the importance of the secret to Myriad's business:

**Q:** What sort of investment did Myriad make in developing Risk Manager?

**A:** The original investment that I discussed in '99 and in 2001 through investment, and one other source, approximately $ million was put into our company and invested in our platform.

**Q:** How important has the Risk Manager system been to Myriad's business?

**A:** It is our core business and it represents about 90 percent of our revenues, and we reinvest the funds from the profit that we put back into the company basically.

**Q:** And you're regarded as a proprietary system?

**A:** Absolutely. It's our soup to nuts and we wrote every line of code in it.[158]

Finally, Hugh Inglis testified that there was no readily available alternative to Myriad's Risk Manager System at the time Myriad denied Alltech access to Risk Manager, and Alltech spent at least $800,000 to build a replacement system.[159] The jury was entitled to consider these additional facts and any other unique factors in this particular case that might have been affected by the parties' agreement.

The jury was instructed that any estimation of reasonable royalty damages cannot be based on sheer speculation, and that if too few facts exist then reasonable royalty damages cannot be awarded to Myriad.[160] Viewing all of the evidence in the light most favorable to the verdict, the Court concludes that the jury did not base its award on sheer speculation. Rather, as demonstrated above, sufficient evidence was presented to support the jury's verdict of $250,000 in royalty damages.

### 5. No Evidence Of Punitive Damages

 Turning to Alltech's final argument regarding Myriad's damages, the Court concludes that Myriad may not recover the $2 million in exemplary damages awarded by the jury. Alltech argues that the jury's punitive damages award fails for three reasons. First, relying on its argument that there is no evidence of reasonable royalty damages, Alltech contends

*Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1208 (5th Cir.1986); *Calce v. Dorado Exploration, Inc.*, 309 S.W.3d 719, 738 (Tex.App.Dallas 2010, no pet.)("prices past purchasers or licensees may have paid").

**157.** *See, e.g.*, Trial Exs. P–250, P–256.

**158.** March 2, 2008 Trial Transcript, Vol. 2 (Dkt. No. 445) at 134:5–18.

**159.** *See* March 3, 2010 Trial Transcript, Vol. 2 (Dkt. No. 443) at 67:7–21 ("I knew the [APPRISE and AIMS]" contracts were coming up for renewal, and so my thought was, what do I do if Myriad gives us 60 days' notice because they can walk and then what am I going to do? So—in our business preparedness is the key to success. And I went to Mahesh and said, "Mahesh, what would happen if they cancelled us and we had to develop our own system?" I said, "I need you to get together with our folks and come up with a scenario that you think is doable that we could replace their system."); 54:3–7 (cost of Aires); 79:12–15 (cost of Pegasus); 203:5–8 (cost of replacing Aires).

**160.** Jury Instruction No. 28 (Dkt. No. 416) at p. 40.

that the punitive damages award cannot stand in the absence of actual damages.[161] As outlined above, the Court has found sufficient evidence of reasonable royalty damages, and therefore, Alltech's first argument is overruled. The Court will address each of the two remaining arguments in turn.

### a. No Evidence of Actual Malice

Second, Alltech correctly contends that there is not clear and convincing evidence of actual malice.[162] In response, Myriad maintains that the great weight of the evidence supports the jury's finding that Alltech acted with actual malice.[163] Actual malice is defined in the Texas Civil Practice and Remedies Code as "a specific intent by the defendant to cause substantial injury or harm to the claimant."[164] Thus, to establish that Alltech acted with malice, Myriad had to prove that Alltech possessed a specific intent to cause substantial injury or harm to Myriad.

Myriad has cited to ample evidence in the record that Alltech engaged in wrongful conduct. Myriad has also provided evidence that it suffered financial harm from Alltech's conduct. Myriad, however, has failed to pinpoint any evidence presented at trial that Alltech specifically intended to harm Myriad. As the Texas Supreme Court has explained, a mere showing that the act is wrong or unlawful is not suffi-

cient to support an award of exemplary damages.[165]

This Court has conducted an independent review of the trial record, and after an exhaustive review of every page in the record, this Court has also failed to identify any evidence that Alltech had the specific intent to cause substantial injury or harm to Myriad. Rather, the evidence merely indicates that Alltech intentionally and wrongfully misappropriated Myriad's trade secrets when creating its own replacement system. But as the Fifth Circuit has explained, "[m]erely because a tort is classified as intentional does not mean that any injury caused by the tortfeasor is willful. This case illustrates the distinction, since misappropriation of proprietary information and misuse of trade secrets are wrongful regardless of whether injury is substantially certain to occur."[166] Consequently, Texas law does not permit Myriad to recover the punitive damages awarded.

### b. No Implied Malice

Myriad is also unable to recover punitive damages under the "implied malice" standard. Myriad's alternative contention is that "in Texas, malice may be implied from a finding that a defendant knowingly misappropriated trade secrets without justification, and such a finding alone will support an award of exemplary damages."[167] Myriad relies solely upon U.S. Sporting

---

161. *See* Alltech's Resp. (Dkt. No. 449) at pp. 14–15.

162. *Id.* at p. 15.

163. Myriad's Reply (Dkt. No. 464) at p. 12.

164. Tex. Civ. P. & Rem.Code § 41.001(7).

165. *See Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 454 (Tex.1996).

166. *Matter of Miller,* 156 F.3d 598, 604 (5th Cir.1998).

167. Myriad's Reply (Dkt. No. 464) at pp. 11–12 (citing *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 222–23 (Tex.App.-Waco 1993, writ denied)).

Alltech's only countervailing argument is that the "caselaw cited for the proposition that implied malice can support punitive damages has been superseded by the 2003 amendment of Tex. Civ. Prac. & Rem.Code § 41.003, in which proof of malice was made more difficult by changing the definition of malice, foreclosing punitive damages based on just implied malice." Alltech's Sur–Reply (Dkt. No. 466) at p. 7. Alltech is incorrect that

*Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214 (Tex.App.Waco 1993, writ denied), for its proposition that implied malice applies to trade secret misappropriation claims for purposes of assessing exemplary damages.[168] However, Myriad's reliance on this case is misplaced for three primary reasons.

First and foremost, *U.S. Sporting Products* decision was released on September 29, 1993, and a painstaking *Erie* analysis reveals that the implied malice standard articulated in *U.S. Sporting Products* was superseded by a 1995 amendment to section 41.002(a) of the Texas Civil Practice and Remedies Code.[169] Historically, Texas

the implied malice standard has been superseded by the 2003 amendment of section 41.003.

Rather, the 2003 amendment merely amended the definition of "malice." From 1995 to 2003, section 41.003, provided a two-prong definition of malice, with the first prong consisting of specific intent and the second prong consisting of gross negligence. *See* Act of April 12, 1995, 74th Leg., R.S., ch. 19, § 1, Tex. Gen. Laws 108, 109–13; Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, Tex. Gen. Laws 37, 44–46. Specifically, prior to the 2003 amendment, "malice" was defined as

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*See* Act of April 12, 1995, 74th Leg., R.S., ch. 19, § 1, Tex. Gen. Laws 108, 109–13. "In 2003, the legislature amended sections 41.001 and 41.003 of the Texas Civil Practice and Remedies Code, creating a separate section defining 'gross negligence,' which in the former version was included as an alternate definition of "malice," and establishing gross negligence as a separate basis for exemplary damages." *O'Donnell v. Smith*, 234 S.W.3d 135, 147 (Tex.App.San Antonio 2007), *aff'd*, 288 S.W.3d 417 (Tex.2009). The 2003 amendment had no effect on the common law "implied malice" standard. However, as explained below, the implied malice standard has been superseded by a 1995 amendment to section 41.002(a).

168. Myriad's Reply (Dkt. No. 464) at p. 12.

169. An in-depth examination of Chapter 41's legislative genealogy raised the issue of whether the 1995 amendment to section 41.002 of the Texas Civil Practice and Remedies Code abrogated the implied malice standard for purposes of assessing exemplary damages. Neither the Texas Supreme Court nor the Fifth Circuit Court of Appeals have examined the issue. Likewise, no Texas court of appeals or federal district court has ever considered the issue. As such, the issue is one of first impression in Texas. Consequently, this Court must make an *Erie* "guess" on this issue, and follow the rule that this Court concludes the Texas Supreme Court would adopt. *See Am. Indem. Lloyds v. Travelers Property & Cas. Co.*, 335 F.3d 429, 435 (5th Cir.2003).

The Court's independent research has only revealed eight cases that have applied the implied malice standard after the enactment of the 1995 amendment. Each of the eight cases are from a Texas court of appeals. However, none of these cases addressed the issue of whether the 1995 amendment to section 41.002(a) of the Texas Civil Practice and Remedies Code abrogated the use of the implied malice standard for purposes of assessing exemplary damages. For this reason, these cases cannot be relied upon as an indication that implied malice survived the 1995 amendment. These eight cases cannot relied upon for three additional reasons—either: (1) the case applied the pre–1995 codification of section 41.002(a); (2) the case relied upon an authority issued prior to the 1995 amendment; or (3) the case relied upon *Taiwan Shrimp Farm Village Ass'n, Inc. v. U.S.A.*, 915 S.W.2d 61 (Tex.App.Corpus Christi 1996), but the cause of action in *Taiwan Shrimp Farm* accrued in 1993 and the *Taiwan Shrimp Farm* court relied upon cases from 1975, 1984, and 1990. Consequently, these eight cases provide no guidance in the Court's Erie guess. *See Kinder Morgan N. Tex. Pipeline, L.P. v. Justiss*, 202 S.W.3d 427, 447–48

common law defined actual malice (malice in fact) as "ill-will, spite, evil motive, or purposing the injuring of another." [170] In contrast, Texas common law allowed the application of implied or legal malice when wrongful conduct was intentional and without just cause or excuse.[171] In 1987, the Texas legislature codified the rules governing punitive damages.[172] The legislature adopted the common law actual malice definition.[173] The statute did not—and has not—incorporated the implied malice standard. Nevertheless, as originally enacted, Chapter 41 did not abrogate the common law implied malice standard either. Chapter 41, however, has since been amended to abrogate the implied malice standard.

Section 41.002(a) of the Texas Civil Practice and Remedies Code dictates the applicability of Chapter 41.[174] As originally enacted, the applicability of section 41.002 was limited. When enacted, Chapter 41 only applied to "[a]n action in which a claimant seeks exemplary damages relating to a cause of action as defined by Section 33.001." [175] Stated more clearly, with incorporation of section 33.001, "Chapter 41 applied to any action for negligence and any action for personal injury, property damage, or death based on strict liability, products liability, or breach of warranty, but there were sixteen exceptions." [176] Prior to 1995, at least one court of appeals held that implied malice was sufficient in order to award punitive damages for any claim not listed in Section 33.001 because Chapter 41 only applied to the causes of action listed in Section 33.001,[177] Notably, misappropriation was

(Tex.App.Texarkana 2006, no pet.)(current issue not raised/discussed and the court cited case from 1982); *Cass v. Stephens*, 156 S.W.3d 38, 73 (Tex.App.–El Paso 2004, pet. denied)(the court specifically noted that the pre-1995 codification of Ch. 41 applied because "action was filed on November 4, 1986."); *Leach v. Conner*, No. 13–01–468–CV, 2003 WL 22860911, at *11 (Tex.App.Corpus Christi Dec. 4, 2003, no pet.)(current issued not raised/discussed and the court relied upon *Taiwan Shrimp Farm*); *Lewis v. Dunn*, 1999 WL 34973348, at *3–4 (Tex.App.-Corpus Christi Jan.28, 1999, no pet.)(current issue was not raised and the court relied upon *Taiwan Shrimp Farm* and *Transfer Products*); *Camacho v. Villareal*, 1999 WL 173690, at *3 (Tex.App.-Dallas March 31, 1999, no pet.)(current issue not raised/discussed and the court cited a 1988 case for the proposition that a finding of implied malice is sufficient to support exemplary damages, but court did not apply implied malice standard); *Gorges Foodservice, Inc. v. Huerta*, 964 S.W.2d 656, 674 n. 12 (Tex.App.Corpus Christi 1997, no pet.)(the court specifically noted that the court was applying the pre–1995 codification because the cause of action accrued before September 1, 1995); *Beaumont Transit Co. v. Bean*, No. 09–95–385 CV, 1997 WL 126790, at *4–5 (Tex.App.Beaumont March 20, 1997, writ denied)(issue not raised/discussed, the court cited "Vernon Supp. 1991," and the court relied upon *Taiwan Shrimp Farm*); *Taiwan Shrimp*

*Farm Village Ass'n, Inc. v. U.S.A.*, 915 S.W.2d 61, 72 (Tex.App.Corpus Christi 1996, writ denied)(action accrued in 1993, issue not raised/discussed, and relied on cases from 1990, 1984, and 1975).

170. *Clements v. Withers*, 437 S.W.2d 818 (Tex. 1969).

171. *See Thompson v. Grand Intern. Broth. Locomotive Eng'rs*, 41 Tex.Civ.App. 176, 91 S.W. 834, 839 (Tex.Civ.App.1905) ("An old definition of malice will do very well here: 'It means a wrongful act done intentionally without just cause or excuse.' ").

172. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 45.

173. *Id.*

174. *See* Tex. Civ. Prac. & Rem.Code § 41.002(a).

175. *See* Act of June 3, 1987, 70th Leg., 1st C.S., ch. 2, § 2.12, 1987 Tex. Gen. Laws 37, 45.

176. *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 676 (Tex.2008).

177. In *Transfer Prods., Inc. v. Texpar Energy, Inc.*, the trial court found "that appellants

not and is not listed in Section 33.001. Since its enactment, the Texas Legislature has amended Chapter 41 six times—twice in 1989, twice in 1995, once in 1997, and once in 2003. The 1995 amendment is the only amendment that has dispositive bearing on the current issue.[178]

In 1995, the 74th Texas Legislature "passed significant and far-reaching tort reform legislation." [179] As part of that tort reform, the Legislature amended section 41.002(a) to mandate that Chapter 41 "applies to *any* cause of action in which a claimant seeks exemplary damages relating to a cause of action." [180] Thus, the

converted appellee's property with implied malice." *Transfer Prods., Inc. v. Texpar Energy, Inc.*, 788 S.W.2d 713, 714 (Tex.App.Corpus Christi 1990, no writ). Based on this finding, the trial court awarded appellee $1,000 in exemplary damages. *Id.* On Appeal, the appellee argued that the award of exemplary damages violated Chapter 41 of the Texas Civil Practice And Remedies Code because "41.001(6) sets out a different definition of 'malice' and claims that appellee failed to prove the elements, as § 41.003(a) requires, to support an award of exemplary damages." *Id.* at 717. The appellate court concluded that an implied malice was sufficient because Chapter 41 " 'applies to an action in which a claimant seeks exemplary damages relating to a cause of action as defined by Section 33.001.' The theory in this case, conversion, does not fall into any of the categories listed in § 33.001. Thus, Chapter 41 does not apply and does not supersede the common law of conversion." *Id.*

**178.** In 1989, the Legislature amended section 41.002 to provide that sixteen exceptions to Chapter 4. Thus, after 1989, Chapter 41 did not apply to an action: (1) brought under the DTPA; (2) brought under Chapter 21 of the Insurance Code; (3) brought under the Texas workers' compensation laws; (4) to recover exemplary damages against an employer by an employee's beneficiaries in a death action; (5) governed by Chapter 81 of the Texas Civil Practice and Remedies Code; (6) brought under Chapter 246; (7) brought under Chapter 547; (8) brought under Chapter 54, 91, or 92 of the Property Code; (9) brought under the Texas Manufactured Housing Standards Act; (10) brought under the Texas Mot. Vehicle Commission Code; (11) brought under the Texas Proprietary School Act; (12) brought under Section 9.507 or Section 27.01 of the Business & Commerce Code; (13) brought under Chapter 36 of the Family Code; (14) brought under the Health Spa Act; (15) brought under the Business opportunity Act; (16) brought under the Texas Timeshare Act. *See* Act of 1989, 71st Leg., ch. 380, Sec. 5, eff.

Sept. 1, 1989 The Second 1989 amendment merely eliminated exception (5) from the foregoing list. *See* Acts 1989, 71st Leg., ch. 1129, Sec. 16, eff. Sept. 1, 1989

Thereafter, the September 1, 1995 amendment eliminated the entire laundry list of exceptions, items (1)-(16). *See* Acts of April 20, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109; *See also Hall v. Diamond Shamrock Refining Co., L.P.*, 82 S.W.3d 5, 19 (Tex.App.San Antonio 2001), *rev'd on other grounds*, 168 S.W.3d 164 (Tex.2005)("In 1995, the 74th Legislature enacted two amendments to Chapter 41 of the Civil Practices and Remedies Code. On April 20, 1995, the legislature enacted Senate Bill 25, which removed the laundry list of exceptions to section 41.002(b) of the Civil Practices and Remedies Code."). The May 30, 1995 amendment, "was simply a conforming amendment that updated the statutory references within the subsection (b) exceptions for those cases to which the exceptions in subsection (b) would continue to apply, namely, to those causes of action that accrued prior to September 1, 1995." *Hall v. Diamond Shamrock Refining Co., L.P.*, 82 S.W.3d at 20; *See also* Act of May 30, 1995, 74th Leg., R.S., ch. 260, § 9, 1995 Tex. Gen. Laws 2207, 2474.

The 1997 amendment only amended subpart (b) of section 41.002. *See* Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 4.01, 1997 Tex. Gen. Laws 327, 328–329.

Finally, in 2003, "The word 'exemplary' was deleted ... although the substantive provisions of Chapter 41 continue to apply only to exemplary damages.' " *Flores v. Millennium Interests, Ltd.*, 185 S.W.3d 427, 438 n. 9 (Tex.2005); *See also* Acts of June 11, 2003, 78th Leg., R.S., ch. 204, § 13.04, Tex. Gen. Laws 847, 888.

**179.** *R & R Contractors v. Torres*, 88 S.W.3d 685, 698 (Tex.App.Corpus Christi 2002).

**180.** Act of Apr. 6, 1995, 74th Leg., R.S., ch. 19, § 1, 1995 Tex. Gen. Laws 108, 109 (emphasis added).

1995 amendment simply deleted the limiting language "as defined by Section 33.001." [181] Consequently, Chapter 41 is no longer limited to actions for negligence, personal injury, property damage, and death based on strict liability, products liability, or breach of warranty. As amended, Chapter 41 "applies broadly" to *any* cause of action.[182] Section 41.002(a) has retained this language since 1995.[183] Therefore, Chapter 41 now "applies to any cause of action seeking punitive damages, whether based in law or equity ...," including trade secret misappropriation.[184]

■ Of equal importance, section 41.003 mandates that "exemplary damages may be awarded *only* if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence." [185] Section 41.003 does not permit exemplary damages for implied malice. The Texas Supreme Court recently observed that "[t]he clearest expression of a mandatory condition is to say 'only if.'" [186] Thus, when read in conjunction as required, section 41.002(a) and section 41.003(a) dictate that in *any* action in which a claimant seeks damages relating to a cause of action,—such as the present case—exemplary damages may not be awarded unless the claimant proves by clear and convincing evidence that the harm results from fraud, malice or gross negligence.[187]

Notably, the 1995 amendment only applied to causes of action accruing on or after September 1, 1995. As indicated, *U.S. Sporting Products* was decided in 1993, and the case was therefore governed by the 1989 codification of Chapter 41. Also, the cause of action at issue in *U.S. Sporting Products*—common law misappropriation—did not fall into any of the categories listed in section 33.001. In fact, the *U.S. Sporting Products* court made certain to specifically note that section 41.002(a) was inapplicable because it did not apply to intentional torts.[188] Accord-

181. *Id.*

182. *Flores v. Millennium Interests, Ltd.,* 185 S.W.3d 427, 438 (Tex.2005).

183. *See* Tex. Civ. P. & Rem.Code § 41.002(a).

184. *Yeckel v. Abbott,* No. 03-04-00713-CV, 2009 WL 1563587, at *10 (Tex.App.Austin June 4, 2009, pet. denied).

185. Tex. Civ. Prac. & Rem.Code § 41.003(a)(1)-(3)(emphasis added).

186. *Regal Fin. Co., Ltd. v. Tex. Star Motors, Inc.,* 53 Tex. Sup.Ct. J. 1034, 2010 WL 3277132, at *4 (Tex. Aug. 20, 2010).

187. This Court acknowledges that in 1996, the Texas Supreme Court explained that in Texas:
... malice may be either actual or implied ... The type of malice necessary to support punitive damages varies with the nature of a wrongful act at issue in any given category or particular in any given category or particular type of case. In some types of cases a finding of actual malice is necessary to support exemplary damages, while in others mere legal malice is sufficient.
*Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 452-53 (Tex.1996). However, the Texas Supreme Court was considering whether implied malice was sufficient to award punitive damages for violation of Texas Labor Code 451.001. The Court specifically noted that Chapter 41 was inapplicable to its analysis: "We note that the Texas Legislature has redefined malice as it relates to the recovery of exemplary damages in certain causes accruing on or after September 1, 1995. *See* Tex. Civ Prac. & Rem.Code § 41.001(7). However, this provision, like all of Chapter 41 of the Texas Civil Practices and Remedies Code, which sets out the statutory requirements for the imposition of exemplary damages, does not apply to actions brought under the workers' compensation laws of this state (Title 5, Labor Code). See Tex.Civ.Prac. & Rem.Code § 41.002(b)(3)." *Id.* at 452, n. 4.

188. *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 221 (Tex.App.Waco 1993, writ denied).

ingly, the *U.S. Sporting Products* court was seemingly correct in its application of implied malice to the facts of that case. However, as explained above, Chapter 41 is no longer limited to the causes of action listed in section 33.001. Therefore, the holding in *U.S. Sporting Goods* does not govern this case. Rather, Myriad's trade secret misappropriation is governed by Chapter 41, and section 41.002(a) requires actual malice—not implied malice. As explained above, Myriad has failed to present sufficient evidence to satisfy the actual malice standard.

■ *U.S. Sports Products* is not applicable to the facts in this case for two additional reasons. *U.S. Sporting Products* involved a claim for unfair competition by misappropriation, also known as common law misappropriation.[189] Therefore, contrary to Myriad's assertion, the *U.S. Sporting Products* court did not specifically hold that "malice may be implied from a finding that a defendant knowingly misappropriated trade secrets without justification."[190] Rather, the court held that implied malice is the appropriate standard for assessing exemplary damages in a common law misappropriation case.[191] Trade secret misappropriation and common law misappropriation are very similar causes of action, but they are nonetheless distinct causes of action. As the *U.S. Sporting Products Court* explained:

> The law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters. Within the broad scope of unfair competition are the independent causes of action such as trade-secret law ... and misappropriation, to name only a few.[192]

The jury in this case found from a preponderance of the evidence that Alltech's actions did not constitute common law misappropriation (unfair competition by misappropriation).[193] Myriad has not provided, nor has a diligent search by the Court produced, any legal authority that expressly supports Myriad's proposition that implied malice is the proper standard for awarding exemplary damages in a trade secret misappropriation case. Without guidance from the Texas Supreme Court, the Fifth Circuit, or a Texas court of appeals, this Court is unwilling to expand the application of implied malice—to the extent the implied malice standard is still viable under Texas law.

Finally, in *U.S. Sports Products*, the jury found that the defendants "committed the misappropriation 'knowingly, willfully, and deliberately.'"[194] The court specifically explained that its holding was based on the jury's finding that the defendants committed the misappropriation "knowingly, willfully, and deliberately."[195] Here, Myriad did not request a "knowing, willful or deliberate" finding. Nor did Myriad request a jury instruction on implied malice.[196] In fact, Myriad relied upon an im-

---

189. *Id.* at 222–23.

190. Myriad's Reply (Dkt. No. 464) at pp. 11–12 (citing *U.S. Sporting Prods., Inc.*, 865 S.W.2d at 222–23).

191. *Id.* at 222.

192. *Id.* at 217.

193. *See* Jury Interrogatories (Dkt. No. 428) at p. 28.

194. *Id.* at 222.

195. *Id.* at 223 ("we hold that this evidence, coupled with the finding that Appellants committed the misappropriation 'knowingly, willfully, and deliberately,' is sufficient to support the award of exemplary damages.")

196. *See* Myriad's Proposed Jury Instruction No. 18 (Dkt. No. 371).

plied malice standard for the first time in its post-verdict reply. Accordingly, for all of the reasons stated above, Myriad's request for punitive damages based upon implied malice must be denied as a matter of law.

### 6. One Satisfaction Rule

The Court has already concluded that Myriad is not entitled to recover lost profits for breach of contract, but the Court will further show that the jury's award of royalty damages for trade secret misappropriation and lost profits for breach of the AIMS and APPRISE Agreements is a violation of the one satisfaction rule. Alltech correctly complains that "the breach of contract and misappropriation damages compensate Myriad for a single alleged wrong which caused a single alleged injury."[197] Alltech maintains that Myriad "is made whole if it is compensated for either damages arising out of its breach of contract claim or damages arising out of its claim for misappropriation of trade secrets—but not both."[198] Myriad counters that:

> It is clear from the jury's award on the breach of contract claims that the jury was considering the amounts Myriad

would have earned or would have been paid by Alltech, if Alltech had performed under the contracts. On the other hand, the jury's award for trade secret misappropriation was based on a reasonable royalty under a hypothetical one-year licensing agreement that Myriad and Alltech might have reached apart from the terms of the contracts at issue in this case, had Alltech properly negotiated a license to use the Risk Manager system in its Pegasus replacement.[199]

Applying Texas and Fifth Circuit precedent, the Court agrees with Alltech.

 In Texas, a party is entitled to sue and seek damages on alternative theories of liability.[200] The one satisfaction rule, however, "applies to prevent a plaintiff from obtaining more than one recovery for the same injury."[201] This rule is based on the principle that, with only one injury, "there can, in justice, be but one satisfaction for that injury."[202] The one satisfaction rule therefore "limits a plaintiff's recovery to one of several overlapping theories, notwithstanding that elements required under the separate theories of action vary somewhat, and notwithstanding that the amounts award-

---

197. Alltech's Resp. (Dkt. No. 449) at pp. 6–7.

198. *Id.* at pp. 7–8.

199. Myriad's Mot. (Dkt. No. 433) at pp. 2–3.

200. *See* Tex.R. Civ. P. 48 ("A party may also state as many separate claims or defenses as he has regardless of consistency"); *See also* Fed.R.Civ.P. 8(d)(3)("A party may state as many separate claims or defenses as it has, regardless of consistency.").

201. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex.1991); *See also See Tony Gullo Motors I, LP v. Chapa*, 212 S.W.3d 299, 303 (Tex.2006)("While she could certainly plead more than one theory of liability, she could not recover on more than one"); *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex.1998)("A party is generally entitled to sue and to seek dam-

ages on alternative theories . . . A party is not entitled to a double recovery").

Notably, courts generally apply the one satisfaction rule "when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury." *Stewart Title Guar. Co.*, 822 S.W.2d at 5. However, "[t]he one satisfaction rule also operates in situations where there are no settling co-tortfeasors and liability is adjudicated." *Facciolla v. Linbeck Const. Corp.*, 968 S.W.2d 435, 450 (Tex.App.Texarkana 1998, no writ)(citing *Mayo v. John Hancock Mut. Life Ins. Co.*, 711 S.W.2d 5 (Tex.1986)); *See also Tony Gullo Motors I, LP*, 212 S.W.3d at 303 (applying the one satisfaction rule in a case with only one defendant).

202. *Stewart Title*, 822 S.W.2d at 7.

ed vary from claim to claim."[203] Accordingly, when the actual damages suffered arise out of only one injury, "the one satisfaction rule operates to reduce a plaintiff's adjudicated damages ... even when different acts are involved."[204]

■■■ In this case, Myriad's damages for trade secret misappropriation and breach of the APPRISE and AIMS Agreements compensate for a single, indivisible injury. First, Myriad relied upon the exact same facts to establish both causes of action. The elements of trade-secret misappropriation are: (1) the existence of a trade secret owned by the plaintiff; (2) breach of a confidential relationship or improper discovery of a trade secret; (3) use of the trade secret; and (4) injury.[205] In its Complaint and at trial, Myriad relied upon Alltech's breach of the confidentiality provisions in the APPRISE and AIMS Agreements in order to establish both: (1) a breach of contract, and (2) the second element of its trade secret misappropriation claim—the existence and breach of a confidential relationship:

> Myriad regularly and repeatedly shared proprietary information with Alltech relating to the Myriad Risk Manager system in complete trust and reliance upon Alltech's covenants in the APPRISE and AIMS Agreements regarding Alltech's limited use of such proprietary information.... Alltech has breached its confidential relationship with Myriad regarding such trade secrets and has improperly used Myriad's trade secrets.[206]

Myriad's two theories of recovery are clearly overlapping.

More importantly, Chris Roussel testified that the damage Myriad suffered as a result of the trade secret misappropriation is the loss of its ability to work with FEMA:

Q: What has been the impact on Myriad of Alltech's actions in using Myriad's intellectual property to build this replacement system.

A: Well, essentially they've taken our trade secrets and they've taken us out of the government market. They've taken our trade secrets to use and supply the service to the government market we were providing .... our earnings went down considerably ...[207]

· · ·

Q: The only business that you have lost during this dispute was the agreement that you had with Alltech, correct?

A: What we lost is the opportunity that we had invested in, in serving the government market.[208]

Of great importance to the current issue, it is vital to note that all of the evidence presented at trial indicated that prior to Alltech's breaches and misappropriation, FEMA was Myriad's only government market client. Likewise, Mr. Roussel admitted at trial that Alltech has only used the Pegasus system to service Alltech's contract with FEMA:

Q: And again, with respect to the Pegasus system that they had today, were you aware of them using it for anything other than the FEMA disaster response program?

203. *Household Credit Servs., Inc. v. Driscol,* 989 S.W.2d 72, 80 (Tex.App.–ElPaso 1998, pet. denied).

204. *Facciolla,* 968 S.W.2d at 450.

205. *See, e.g., Trilogy Software, Inc. v. Callidus Software, Inc.,* 143 S.W.3d 452, 463 (Tex. App.-Austin 2004, pet. denied).

206. Myriad's Second Am. Compl. (Dkt. No. 103) at ¶¶ 46 and 48 (allegations for trade secret misappropriation claim).

207. March 2, 2008 Trial Tr. (Dkt. No. 445) at 174:24–175:5.

208. *Id.* at 249:20–24.

A: I am not aware of that, no.[209]

Therefore, when Mr. Roussel testified that Myriad lost the opportunity to serve "the government market," what Mr. Roussel was really saying is that Myriad lost the opportunity to serve FEMA. The jury already awarded Myriad lost profits for money Myriad would have earned if the FEMA-related contracts had been performed as promised. In short, the royalty damages and the lost profits compensate Plaintiff for the same injury—loss of the FEMA business.

As explained above, "[i]n an action for trade secret misappropriation, the plaintiff can recover actual damages based on the value of what has been lost by the plaintiff or the value of what has been gained by the defendant."[210] "The value of what has been lost by the plaintiff is usually measured by lost profits."[211] In contrast, the value of what the defendant has gained as a result of the misappropriation can be measured by a reasonable royalty.[212] In this particular case, the value of what Myriad has lost is the same as the value of what Alltech has gained—fees on the FEMA contract. Notably, the Court is not holding that breach of contract damages and trade secret misappropriation impermissibly compensate for a single injury in every case. On the contrary, the Court can envision instances where damages for breach of a contract are distinct and separate from damages for trade secret misappropriation. For example, in this case, if Alltech had used its Pegasus system in order to obtain or usurp other non-FEMA government contracts then the damages

associated with those non-FEMA contracts would conceivably not violate the one satisfaction rule. In that instance, Myriad would have lost the opportunity to serve "the government market"—apart from FEMA. However, that did not happen in this case. Accordingly, looking at the unique facts of this case, the Court holds that Myriad's lost profits damages for breach of the APPRISE and AIMS and Myriad's reasonable royalty damages for trade secret misappropriation compensate Myriad for a single and indivisible injury.

As a consequence of the above finding, Myriad would normally be required to choose between reasonable royalty damages and lost profit damages. However, in light of this Court's holding that Myriad may not recover lost profits under the APPRISE and AIMS Agreements, Myriad is left without a choice. As explained by Fifth Circuit, "Texas courts have a straightforward way of implementing the one-satisfaction rule with different damage awards for more than one cause of action based on the same harm. The courts simply treat these cases as failures by the plaintiff to elect a single theory of recovery from several alternative theories and use the jury findings affording the greater recovery."[213] The Texas Supreme Court has held that "where the prevailing party fails to elect between alternative measures of damages, the court should utilize the findings affording the greater recovery and render judgment accordingly."[214] In this case, $250,000.00 for reasonable royalty damages indisputably affords Myriad the greatest recovery. Accordingly, the Court will enter judgment on this amount.

---

209. *Id.* at 187:3–6.

210. *Carbo Ceramics, Inc. v. Keefe,* 166 Fed. Appx. 714, 722 (5th Cir.2006).

211. *Id.*

212. *Id.* at 723.

213. *Tompkins v. Cyr,* 202 F.3d 770, 786 (5th Cir.2000).

214. *Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 367 (Tex.1987); accord *Quest Medical, Inc. v. Apprill,* 90 F.3d 1080, 1085 n. 5 (5th Cir.1996).

## B. Alltech's Damages

 As a final issue, Alltech is not entitled to a judgment of $25 million in damages for Myriad's conversion of Alltech's photographs because Alltech did not present evidence of the photographs' fair market value. As outlined above, the jury found from a preponderance of the evidence that Myriad did convert Alltech's inspection photographs.[215] The jury did not, however, award Alltech any damages as compensation for the conversion.[216] For this reason, Alltech asks the Court to overturn the jury's finding of $0 in damages, and to instead, award $25,707,460.00 to Alltech as compensation for Myriad's conversion.[217]

The jury was instructed that:

The proper measure of damages for Defendant Alltech's conversion claims is the fair market value of the inspection photographs at the time and place of the conversion. Fair market value is the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it.[218]

Alltech does not dispute that this jury instruction is, in fact, a *verbatim* iteration of Texas law.[219] In its Response, Alltech contends that it "presented uncontroverted evidence that the fair market value of the inspection photographs at the time of conversion by Myriad was $25,706,-460.00."[220] Myriad, however, correctly highlights that Alltech did not actually present evidence of fair market value.[221] Rather, Alltech only presented evidence of the estimated amount it would cost Alltech to replace the photographs—*i.e.* the "replacement costs."[222] In its Reply, Alltech concedes that it only presented evidence of replacement costs—not evidence of the photographs' fair market value. Alltech nevertheless contends that Texas precedent unequivocally permits the consideration of replacement costs for conversion damages.[223]

---

215. *See* Jury Interrogatory No. 8A (Dkt. No. 428) at p. 41.

216. *See* Jury Interrogatory No. 8B (Dkt. No. 428) at p. 42.

217. *See* Alltech's Resp. (Dkt. No. 449) at pp. 18–19.

218. Jury Instruction No. 30 (Dkt. No. 416) at p. 42.

219. *See, e.g., United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147–48 (Tex.1997)("Generally, the measure of damages for conversion is the fair market value of the property at the time and place of the conversion."); *Exxon Corp. v. Middleton,* 613 S.W.2d 240, 246 (Tex.1981)("Market value is defined as the price property would bring when it is offered for sale by one who desires, but is not obligated to sell, and is bought by one who is under no necessity of buying it."). In fact, Alltech proposed a similar jury instruction:

The proper measure of damages for conversion is generally the fair market value of the converted material on the date that it was converted, plus any other losses suffered as a natural and proximate cause of the conversion. In this case, if you find that Plaintiff converted property belonging to the Defendant, you may award Defendant the fair market value of the converted property on the day and at the place from which it was converted along with any other losses or expenses which were a natural and proximate cause of the conversion.

Alltech's Proposed Instruction No. 11 (Dkt. No. 370). Notably, Alltech did not request an instruction regarding replacement value.

220. *See* Alltech's Resp. (Dkt. No. 449) at p. 18.

221. *See* Myriad's Reply (Dkt. No. 464) at pp. 14–15.

222. *Id.*

223. Alltech's Sur–Reply (Dkt. No. 466) at p. 10 (citing *Aronovich v. Foresight Tech.,* 1997 WL 67817, 1997 Tex.App. LEXIS 619 (Tex. App.-San Antonio 1997, no writ)).

Reviewing the evidence presented at trial, Myriad is correct that Alltech only presented evidence of replacement cost. Hugh Inglis provided the following testimony on direct examination:

**Q:** As of March 28, 2008, when you were cut off of the Apprise system, what would it have cost *to replace those photographs?*

**A:** ... We would have an inspector go back and retake the photos so that we could have them on file. And we would have to pay those inspectors and established a fee and negotiation, $20 an applicant visit. $20 not per photo but $20 to visit that house and take the photos. And that was predicated on the fact that the inspector would have to get the list, they'd have to make an appointment, they'd have to drive to the house, they'd have to take the photos, and then, obviously go back to where they were and go on to the next one. So we thought that was *a reasonable cost to do that kind of replacement.*[224]

Mr. Inglis explained that the $20 per photo figure was based on quotes Alltech had received in the past to obtain replacements.[225] Likewise, Alltech's damages expert, James Davis, testified that the $20 million figure presented at trial represented "the contingent *cost for the replacement* of photos for the inspections. It's based upon the total number of inspections being 1,285,323 at a rate of $20, and that's per inspection, not photograph."[226]

Looking at this testimony, the Court is of the opinion that reasonable and fairminded persons in the exercise of impartial judgment could conclude that Alltech was not entitled to any conversion damages because Alltech did not satisfy its burden of presenting evidence of the fair market value of the photographs to either a seller or a buyer.[227]

It is also important to note that the precedent Alltech relies upon for the proposition that "caselaw ... unequivocally permits ... consideration [of replacement costs] for conversion damages"—*Aronovich v. Foresight*—is not applicable to the present issue at hand. In that case, Foresight hired Aronovich, a freight forwarding company, to move Foresight's equipment to Mexico.[228] Thereafter, Foresight sued Aronovich when its equipment did not arrive in Mexico.[229] Aronovich never filed an answer in the lawsuit and failed to appear at a default judgment hearing.[230] At the default judgment hearing, Foresight submitted an affidavit from its president as evidence of its unliquidated damages.[231] The affidavit stated that Foresight expended $21,950 to buy equipment to replace the original missing equipment.[232] The trial court granted the default judgment against Aronovich, and awarded the requested $21,950 to Foresight.[233] On appeal, Aronovich complained that the trial court erred in awarding damages because there was no

**224.** March 3, 2010 Trial Tr. (Dkt. No. 443) at 47:13–48:6 (emphasis added).

**225.** *Id.* at 48:5–25.

**226.** *Id.* at 203:16–19 (emphasis added).

**227.** *Brown v. Bryan Cnty., OK,* 219 F.3d 450, 456 (5th Cir.2000) (citations omitted).

**228.** *See Aronovich v. Foresight Techn., Inc.,* No. 04–95–00652–CV, 1997 WL 67817, at *1 (Tex.App.–San Antonio Feb. 12, 1997, no writ).

**229.** *Id.*

**230.** *Id.*

**231.** *Id.*

**232.** *Id.*

**233.** *Id.*

evidence of the fair market value of the equipment.[234] The appellate court held that absent controlling authority to the contrary, the affidavit testimony stating the replacement cost of the equipment was sufficient to establish the amount of unliquidated damages for purposes of the default judgment.[235]

Of import here, the Aronovich court specifically stated that it "found no authority, nor has Aronovich cited us to any authority, which does not allow Foresight to establish the fair market value of the equipment by introducing evidence of its replacement cost."[236] Therefore, the Court's holding was explicitly based upon the absence of "controlling authority to the contrary."[237] Here, both Myriad and the Court have identified one contrary authority that speaks to the precise issue at hand—sufficiency of the evidence at trial. Specifically, in 2008—eleven years after the Aronovich decision was issued—the Texas court of appeals in San Antonio held that evidence in a conversion case was factually insufficient where the jury award reflected replacement value of property, but the proper legal standard was the fair market value.[238] Sitting as an Erie court, this Court is not permitted to ignore the Texas court of appeals's holding.[239]

Furthermore, Myriad is correct that "[t]he quotation from Aronovich is taken out of context as the replacement costs in Aronovich supported the fair market value determination because the plaintiff actually purchased the substitute goods from the open market. In contrast, the hypothetical replacement costs that Alltech presented have absolutely no relationship to what an actual buyer would have paid for the photographs."[240] Moreover, Alltech does not actually need to or intend to replace every photograph. And unlike Aronovich, this case is not a default judgment case. Rather, this case went to trial and the jury was properly instructed that the applicable standard was "the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it." The Court "presumes that the jury heard, understood, and followed the trial court's instructions."[241] The Court will therefore not overturn the jury's verdict.

234. Id.

235. Id. at *2.

236. Id.

237. Id.

238. See Ayala v. Valderas, No. 2–07–134–CV, 2008 WL 4661846, at *5 (Tex.App.Fort Worth Oct. 23, 2008, no pet.); See also Bishop v. Geno Designs, Inc., 631 S.W.2d 581, 584 (Tex. App.-Tyler 1982, no writ) (holding evidence insufficient to support damages award because no evidence of fair market value of property converted).

239. It is settled that if the State's highest court has not spoken on the particular issue, "it is the duty of the federal court to determine as best it can, what the highest court of the state would decide." Transcon. Gas v. Transp. Ins. Co., 953 F.2d 985, 988 (5th Cir. 1992). As such, the United States Supreme Court has dictated that:

> ... it is still the duty of federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the State. An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what state law is, would be followed by a federal court in deciding a state question.

Fid. Union Trust Co. v. Field, 311 U.S. 169, 177–78, 61 S.Ct. 176, 85 L.Ed. 109 (1940).

240. Myriad's Resp. To Sur–Reply (Dkt. No. 485) at p. 2.

241. Hand v. UNUM Provident Corp., 202 Fed. Appx. 689, 695 (5th Cir.2006).

Finally, this Court holds that Alltech would be unjustly enriched if the Court were to award Alltech $25,706,460.00 for conversion of the photographs. The Texas Supreme . Court has admonished that "[a] conversion should not unjustly enrich either the wrongdoer or the complaining party."[242] The evidence at trial was that FEMA made twelve requests for photographs over a two-year period.[243] Hugh Inglis and Mr. Roussel both testified that each time FEMA requested photographs, Myriad—the wrongdoer—promptly provided the photographs to FEMA.[244] In fact, Mr. Inglis testified that Myriad "became more than cooperative with the government to give them the photos."[245] Myriad recently provided evidence in support of its motion that it returned all of the converted photographs to Alltech on March 22, 2010, per the jury's written request.[246] Finally, Mr. Inglis testified that the government owns the photographs.[247] This Court recognizes that "conversion can take place even when the person in possession does not have title to property, so long as he has a right of possession."[248] But the Court concludes that awarding Alltech $25 million in contravention of the jury's verdict would un-justly enrich Alltech for its lost right of possession. For all of the above reasons, the Court must deny Alltech's request to overturn the jury's verdict on conversion damages.

In final conclusion, the Court enters the following Final Judgment on the above conclusions of law pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**IT IS THEREFORE ORDERED** that Myriad Development, Inc.'s Motion For Judgment (Dkt. No. 433) is hereby **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Alltech, Inc.'s Opposition To Plaintiff's Motion For Judgment And Defendant's Motion To Enter Judgment To Conform The Verdict To The Evidence (Dkt. No. 449) is hereby **GRANTED IN PART AND DENIED IN PART.**

**IT IS FURTHER ORDERED** that Myriad **SHALL RECOVER** $21,263.00 for unpaid amounts under the APPRISE Agreement.

**IT IS FURTHER ORDERED** that Myriad **SHALL RECOVER** prejudgment interest from Alltech on the amount of $21,263.00, at the rate of 5.0 percent.[249] The prejudgment interest shall accrue be-

**242.** *United Mobile Networks, L.P. v. Deaton,* 939 S.W.2d 146, 147–48 (Tex.1997).

**243.** March 2, 2010 Trial Tr. (Dkt. No. 445) at 164:18–24; March 3, 2010 Trial Tr. (Dkt. No. 443) at 45:11–15.

**244.** *Id.* at 164:25–165:3.

**245.** March 3, 2010 Trial Tr. (Dkt. No. 443) at 46:24–47:1.

**246.** *See* Myriad's Reply (Dkt. No. 464–1) at Ex. A.

**247.** March 3,2010 Trial Tr. (Dkt. No. 443) at 44:2–11.

**248.** *Soto v. Sea–Road Intern., Inc.,* 942 S.W.2d 67, 72 (Tex.App.-Corpus Christi 1997, pet. denied).

**249.** The Fifth Circuit has explained that "in diversity cases ... pre-judgment interest is calculated under state law." *Boston Old Colony Ins. Co. v. Tiner Assocs., Inc.,* 288 F.3d 222, 234 (5th Cir.2002). Under Texas law, when an applicable interest rate is not specified in the breached contract, pre-judgment interest is calculated based on the statutory rate for postjudgment interest provided in section 304.003 of the Texas Finance Code. *See* Tex. Fin.Code § 304.003; *See also Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines, Inc.,* 278 F.3d 494, 500 (5th Cir.2002)("Texas common law allows prejudgment interest to accrue at the same rate as postjudgment interest on damages awarded for breach of contract"). That statutory section sets the following interest rate:

(1) the prime rate as published by the Board of Governors of the Federal Reserve System on the date of computation; [or]

ginning on April 2, 2008 and ending on the day preceding the date of this Judgment.

IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** post-judgment interest from Alltech on the amount of $21,263.00, at a rate of 0.25 percent *per annum* from the date of this Judgment until paid in full.[250]

IT IS FURTHER ORDERED that Myriad **SHALL NOT RECOVER** lost profits for breach of the APPRISE Agreement.

IT IS FURTHER ORDERED that Myriad **SHALL NOT RECOVER** lost profits for breach of the AIMS Agreement.

IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** $198,110.00 in unpaid amounts under the Subcontract for Labor.

■ IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** prejudgment interest from Alltech on the amount of $198,110.00, at the rate of 6.0 percent.[251] The prejudgment interest shall accrue beginning on April 2, 2008 and ending on the day preceding the date of this Judgment.

IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** post-judgment interest from Alltech on the amount of $198, 110.00, at a rate of 0.23

---

(2) five percent a year if the prime rate as published by the Board of Governors of the Federal Reserve System described by Subdivision (1) is less than five percent; ... TEX. FIN.CODE ANN. § 304.003(c). Because the prime rate is less than five percent, the applicable prejudgment interest rate is five per cent.

250. *See Mitchell Energy Corp. v. Samson Resources Co.*, 80 F.3d 976, 987 (5th Cir. 1996)("Post-judgment interest on money judgments recovered in federal district court is governed by 28 U.S.C. § 1961, even in diversity cases."); *See also* 28 U.S.C. § 1961 ("Interest shall be allowed on any money judgment in a civil case recovered in a district court ... Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment.")

251. Myriad asserts, without discussion or support, that "[a]ll of Myriad's claims in this case are governed by Texas law." Myriad's Mot. (Dkt. No. 433) at p. 4. However, the Subcontract for Labor contains an unambiguous choice of law provision favoring Virginia law: "This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia except with respect to its conflicts of law rules that would require application of the laws of another jurisdiction." Trial Exhibit P–198 (Subcontract For Labor) at Art. 16. Neither Myriad

nor Alltech addressed this point when assessing the applicable prejudgment interest rate. As a result, the Court is left to conduct an independent analysis of the issue—whether Texas' prejudgment interest rate applies or Virgin's prejudgment interest rate applies.

As explained by the Virginia Supreme Court, "the true test for the determination of the proper law of a contract is the intent of the parties...." *Tate v. Hain*, 181 Va. 402, 410, 25 S.E.2d 321, 324 (1943) (per curiam) (internal quotations omitted). This intent "may be expressed in the contract itself" or "may be inferred from the surrounding circumstances." *Id.* Therefore, "Virginia conflicts of law rules generally honor contractual choice of law provisions." *Thornhill v. Donnkenny, Inc.*, 823 F.2d 782 (4th Cir.1987); *See also Bryant Elec. Co., Inc. v. City of Fredericksburg*, 762 F.2d 1192, 1196 n. 8 (4th Cir.1985) (stating that Virginia courts have held that contracting parties may, by agreement, choose what law will govern their contract) (citations omitted).

Here, the choice of law provision at issue indicates that the parties clearly intended for Virginia law to govern the Subcontract for Labor. Therefore, Virginia's conflicts of law rules do not require application of the laws of another jurisdiction. Virginia law dictates that "[i]f the contract or other instrument does not fix an interest rate, the court shall apply the judgment rate of six percent to calculate prejudgment interest pursuant to § 8.01–382 ..." VA.CODE § 6.1–330.54B; *See also* VA.CODE § 8.01–382.

percent *per annum* from the date of this Judgment until paid in full.[252]

IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** $250,000.00 in reasonable royalty for misappropriation of trade secrets.

IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** prejudgment interest from Alltech on the amount of $250,000.00, at the rate of 5.0 percent. The prejudgment interest shall accrue beginning on April 2, 2008 and ending on the day preceding the date of this Judgment.[253]

IT IS FURTHER ORDERED that Myriad **SHALL RECOVER** postjudgment interest from Alltech on the amount of $250,00.00, at a rate of 0.23 percent *per annum* from the date of this Judgment until paid in full.[254]

IT IS FURTHER ORDERED that Myriad **SHALL *NOT* RECOVER** $2,000,000.00 in exemplary damages for misappropriation of trade secrets.

IT IS FURTHER ORDERED that Plaintiff Myriad Development, Inc. shall **TAKE NOTHING** against Alltech, Inc. on Myriad's claims for unfair competition by misappropriation and unjust enrichment.

IT IS FURTHER ORDERED that Alltech shall **TAKE NOTHING** against Myriad on Alltech's counterclaims. Specifically, Alltech **SHALL *NOT* RECOVER** $25,706,460.00 for conversion of the photographs.

IT IS FURTHER ORDERED that the Court shall separately consider and rule upon Myriad's Application for Attorneys' Fees and Costs and Bill of Costs pursuant to Federal Rule of Civil Procedure 54 and Local Rule CV–7(i) of this Court.

IT IS FINALLY ORDERED that this case is hereby **CLOSED**.

---

**252.** *Supra* n. 250.

**253.** *See* Tex. Fin.Code §§ 304.102, 304.103; *See also Retractable Techs., Inc. v. Occupational & Med. Innovations, Ltd.*, No. 6:08 CV 120, 2010 WL 3199624, at *4 (E.D.Tex. Aug. 11, 2010)("Texas law on trade secret claims mandates the award of prejudgment interest.").

**254.** *Supra* n. 250.